MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2023 ME 23
Docket:        Aro-21-312
Argued:        October 6, 2022
Decided:       March 30, 2023

Panel:         STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ.

DENNIS F. WINCHESTER

v.

STATE OF MAINE

CONNORS, J.

[¶1]    Dennis F. Winchester appeals from a judgment of the post-conviction review (PCR) court (Aroostook County, *Stewart, J.*) denying his PCR petitions.  Winchester argues that his counsel's failures to assert his right to a speedy trial constituted ineffective assistance of counsel.  Concluding that the court misconstrued aspects of the relevant law, we vacate the judgment and remand for reconsideration consistent with this opinion.  In doing so, we clarify the contours of the speedy trial protection contained in the Maine Constitution and the interplay between a speedy trial claim and an ineffective assistance of counsel claim when counsel fails to raise a viable speedy trial claim.

## I. BACKGROUND

### A. As of February 2015, Winchester was incarcerated on an earlier criminal conviction.

[¶2] Before the State initiated the cases that are the subject of this appeal, it filed two criminal complaints against Winchester. One of these complaints was dismissed; the other resulted in a conviction for which Winchester was sentenced in February 2015 to five years in prison, with all but three years suspended. These complaints are not the subject of the instant petitions but resulted in Winchester's incarceration during a portion of this case's history.

### B. Winchester was charged in six separate cases in 2014 and 2015; in 2017, he was found guilty after trial in one case and pleaded nolo contendere as to the remaining five cases.

[¶3] Between June 2014 and March 2015, the State charged Winchester in six separate cases that are the subject of this appeal.[1] The following findings of the PCR court, supported by record evidence, describe the chronology of these cases as relevant to the speedy trial issue before us:

---

[1] In Docket No. CR-2014-267, Winchester was charged by complaint on June 3, 2014, and by indictment on July 11, 2014. In Docket No. CR-2014-515, Winchester was charged by complaint on November 10, 2014, and by indictment on January 9, 2015. In Docket Nos. CR-2014-545 and CR-2014-547, Winchester was charged by complaint on November 25, 2014, and by indictment on January 9, 2015. In Docket No. CR-2015-003, Winchester was charged by indictment on January 9, 2015. Finally, in Docket No. CR-2015-067, Winchester was charged by indictment on March 6, 2015. For the purposes of the speedy trial analysis, we need to distinguish only one of the five cases in which he ultimately pleaded nolo contendere, Docket No. CR-2014-267, hereinafter referenced as "the DNA case." These criminal actions, all commenced in Aroostook County, relate primarily to burglaries and thefts.

- April 3, 2015: The trial court (Aroostook County, *Hunter, A.R.J.*) signed an order allowing Attorney Jon Plourde—initially appointed to represent Winchester in all the underlying cases except Docket No. CR-2015-067—to withdraw.

- April 12, 2015: Winchester wrote a letter to the clerk of the court asking whether Plourde had filed a motion for a speedy trial. The clerk erroneously responded that Plourde had filed the motion.

- April 28, 2015: Attorney Neil Prendergast was appointed to represent Winchester in all six cases.

- August 3, 2015: Prendergast filed motions to suppress in all dockets. The hearing on the motions was not held until July 20, 2016. As the PCR court found, it is "unclear from the files" why there was an eleven-month period between the filing of the motions and the hearing.

- October 27, 2016: The court signed an order denying the motions, addressing only one of Winchester's arguments as to why the evidence should be suppressed.

- February 27, 2017: Prendergast moved to withdraw as counsel. The court denied the motion and, in a supplemental order, explained that Prendergast could not withdraw so close to trial in Docket No. CR-2015-067, which was scheduled for March 14, 2017.

- March 14, 2017: Trial in Docket No. CR-2015-067 was cancelled due to a snowstorm, after which the court allowed Prendergast to withdraw.[2]

- April 12, 2017: Attorney Chris Coleman was appointed to represent Winchester.

- May 2017: Winchester completed his sentence for the burglary charge predating the six cases at issue. He continued to be held without bail at the Aroostook County jail throughout the remainder of these

---

[2] For no reason discernible from the record, the trial was never held, with Winchester pleading nolo contendere nine months later.

4

proceedings, however, because his bail had been revoked in the DNA case.

- June 29, 2017: Coleman withdrew because he took other employment. Attorney John Tebbetts was appointed as Winchester's counsel on the same day.

- July 5, 2017: Winchester filed a motion for further findings of fact and conclusions of law regarding the October 27, 2016 order. The court granted the motion the following week.

- August 23, 2017: In response to Winchester's motion for further findings of fact and conclusions of law, the court issued an order describing why the motions to suppress had been denied.

- November 9, 2017: Docket No. CR-2014-545 went to trial; Winchester was found guilty and sentenced to five years in prison.

- December 6, 2017: The DNA case was scheduled for trial. That morning, Winchester pleaded nolo contendere in each of the remaining cases and was sentenced to five-year terms in each, with the sentences to run concurrently to one another but consecutively to the sentence that he received in Docket No. CR-2014-545. Winchester reserved his right to appeal each case based on, inter alia, his right to a speedy trial.

- 2018: Represented by Attorney Tebbetts, Winchester appealed his conviction, arguing that the court erred when it entered orders denying his motions to suppress. We affirmed the trial court's orders on October 18, 2018. *State v. Winchester*, 2018 ME 142, ¶ 18, 195 A.3d 506. We did not address whether Winchester was deprived of the right to a speedy trial, explaining in a footnote that he had abandoned that issue on appeal by failing to present any developed argument either to the trial court or to us. *Id.* ¶ 12 n.4.

In total, the time between when Winchester was initially charged and when each case was resolved ranged from thirty-three to forty-two months.

[¶4]   Winchester filed PCR petitions in January 2019.  The PCR court denied his petitions, applying the federal test from *Barker v. Wingo*, 407 U.S. 514, 530 (1972), to determine whether Winchester's speedy trial rights had been violated.  Winchester then sought a certificate of probable cause from us, arguing that he had been denied effective assistance of counsel due to his attorneys' failures to raise his speedy trial claims.  We denied his request as to Plourde, but we granted it as to Prendergast and Tebbetts.

## II.  DISCUSSION

[¶5]  We review a PCR court's factual findings for clear error and its legal conclusions de novo.  *Fortune v. State*, 2017 ME 61, ¶ 12, 158 A.3d 512.  Because this analysis often involves mixed questions of law and fact, we "apply the most appropriate standard of review for the issue raised depending on the extent to which that issue is dominated by fact or by law."  *Id.* ¶ 13.

A.    **Winchester is entitled to a dismissal of the indictments if he can show that his counsel's ineffectiveness prejudiced his ability to obtain dismissal of charges based on a violation of his right to speedy trial.**

[¶6]  In assessing a claim of ineffective assistance of counsel, we apply the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See, e.g.*, *Theriault v. State*, 2015 ME 137, ¶ 13, 125 A.3d 1163.  A successful showing of ineffective assistance of counsel "requires proof of [(1)] deficient performance

and [(2)] resulting prejudice." *In re Child of Kenneth S.*, 2022 ME 14, ¶ 28, 269 A.3d 242. Counsel's performance is deficient if it falls below "an objective standard of reasonableness," *Ford v. State*, 2019 ME 47, ¶ 11, 205 A.3d 896 (quotation marks omitted), i.e., if the performance falls below what is expected of "an ordinary fallible attorney," *Philbrook v. State*, 2017 ME 162, ¶ 7, 167 A.3d 1266 (quotation marks omitted).

[¶7] To prove resulting prejudice, a petitioner must show that the "errors of counsel actually had an adverse effect on the defense." *Ford*, 2019 ME 47, ¶ 11, 205 A.3d 896 (alteration and quotation marks omitted). The petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* ¶ 14 (quotation marks omitted). When a petitioner challenges a conviction based on a guilty plea, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Laferriere v. State*, 1997 ME 169, ¶ 7, 697 A.2d 1301 (quotation marks omitted). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. ¶ 8 (quotation marks omitted).

[¶8]  The normal remedy when counsel is ineffective, a new trial, does not satisfy constitutional requirements if the speedy trial provision has been violated.  *Barker*, 407 U.S. at 522 (holding that dismissal is the "only possible remedy" for a speedy trial violation); *State v. Smith*, 400 A.2d 749, 752 (Me. 1979) ("The denial of the right to a speedy trial, guaranteed by the Sixth and Fourteenth Amendments of the Constitution of the United States and Article I, Section 6 of the Constitution of the State of Maine, has but one extremely harsh remedy, dismissal of the charges.").

[¶9]  Given this legal predicate, when a defendant raises an ineffectiveness claim based on his counsel's failure to pursue a motion to dismiss on speedy trial grounds, we must consider whether such a motion to dismiss, had it been filed by counsel, would or should have resulted in a dismissal of the charges on speedy trial grounds.  If so, the *Strickland* prejudice prong has been met and, absent a valid strategic reason for counsel's failure to file the motion (such as the defendant's preferences for delay or the need for time to investigate and prepare defenses), counsel's performance was deficient, and we must remand for the petition to be granted and the charges to be

8

dismissed.[3] Also, as discussed below, *see infra* ¶ 28, one factor in assessing the merits of a speedy trial claim is the reason (or reasons) for the delay. For this reason, the question of whether delay constituted a reasonable defense strategy for the purposes of determining whether the *Strickland* deficient performance prong has been met can be subsumed into an analysis of the merits of the speedy trial claim.

[¶10] Because "a claim that appellate counsel was ineffective is, in actuality, an assertion that there was an alleged flaw in the trial proceedings for which appellate counsel neglected to seek relief," *Fortune*, 2017 ME 61, ¶ 16, 158 A.3d 512 (quotation marks omitted), it follows that any prejudice to Winchester as a result of the failure to pursue his speedy trial claims on direct appeal also turns on the likelihood that his speedy trial claims would have been

---

[3] *See Hall v. State,* 663 S.W.2d 926, 927 (Ark. 1984) (dismissing a charge after a guilty plea where counsel at the time of the plea offered no testimony regarding a strategy behind their failure to assert the right to a speedy trial); *People v. Peco*, 803 N.E.2d 561, 565 (Ill. App. Ct. 2004) (explaining that the failure of counsel to claim a speedy trial violation constitutes ineffective assistance of counsel "when there is at least a reasonable probability that the client would have been discharged had a timely motion been filed and there was no justification for the attorney's decision not to file a motion"); *State v. Castro*, 402 P.3d 688, 695 (N.M. 2017) (holding a defendant's right to a speedy trial was not violated because, inter alia, counsel was likely delaying trial in an attempt to push back the defendant's possible deportation); *Commonwealth v. Roundtree*, 364 A.2d 1359, 1363-64 (Pa. 1976) (holding that an attorney's failure to move to quash an indictment despite a delay of over six years constituted ineffective assistance of counsel because, inter alia, the failure could not be regarded as a strategic maneuver); *Nelson v. Hargett*, 989 F.2d 847, 850, 854 (5th Cir. 1993) (vacating the denial of an ineffective assistance claim for further development of the record because it was difficult on the facts "to view [counsel's] failure to pursue the speedy trial claim as the product of a reasonable litigation strategy").

successful had counsel pursued them. *See Flood v. State*, No. E2009-00294-CCA-R3-PC, 2010 Tenn. Crim. App. LEXIS 251, at *14 (Mar. 24, 2010) ("To prevail, the [accused] must establish that his right to a speedy trial was violated and that counsel failed to pursue the issue on appeal.").

[¶11] In sum, the key to assessing the merits of Winchester's petitions is determining whether he had meritorious grounds to move to dismiss the indictments based on his right to a speedy trial. If so, and if no reasonable litigation strategy caused his counsel's pursuit or countenance of delay, then Winchester suffered a constitutional violation, and the sole available remedy is dismissal of the indictments.

## B. We review whether Winchester had meritorious speedy trial claims under the Maine Constitution.

[¶12] In his appeal of the PCR court's denial of his petitions, Winchester's claim rests solely on the Maine Constitution.[4] *See State v. Caouette*, 446 A.2d 1120, 1121 n.2 (Me. 1982) ("The Sixth Amendment claim was not pursued on appeal and we have no occasion to discuss it."). Hence, unless we specifically

---

[4] In his petitions, Winchester did not identify whether he was making a claim under the Maine or United States Constitutions; nor did his counsel delineate between the two before the PCR court; nor did the PCR court delineate when ruling on the petitions.

indicate otherwise, we discuss federal precedent only to the extent that we find it persuasive.

[¶13]   Although Winchester's failure to develop his speedy trial claim under the Maine Constitution at the trial level potentially foreclosed his ability to raise the claim on appeal, *see State v. White*, 2022 ME 54, ¶ 31 n.13, 285 A.3d 262, given the current indeterminate status of our precedent regarding the test for a speedy trial violation under the Maine Constitution, *see infra* n.18, we chose to request supplemental briefing on the issue and invited amicus briefs, *see State v. Jewett*, 500 A.2d 233, 234 (Vt. 1985) (ordering supplemental briefing on an issue relating to the Vermont Constitution).[5]   In light of this briefing and the parties' arguments, we turn to an analysis of article I, section 6 of the Maine Constitution.

**C.      Under article I, section 6 of the Maine Constitution, a flexible balancing test is applied to determine whether the right to a speedy trial has been violated, examining the length of delay, the reasons for delay, the accused's invocation of the right, and prejudice.**

[¶14]   When we construe the Maine Constitution, our review can embrace, without limitation, an examination of text; purpose; history; common

---

[5]  We received four amicus briefs and thank the amici and their attorneys for their helpful submissions.

law, statutes, and rules; economic and sociological considerations; and precedent.  *State v. Moore*, 2023 ME 18, ¶ 18, --- A.3d ---.

### 1.    The text of article I, section 6 is nonspecific.

[¶15]  The Maine Constitution provides: "In all criminal prosecutions, the accused shall have a right . . . [t]o have a speedy, public and impartial trial . . . ." Me. Const. art. I, § 6.  Because Maine separated from Massachusetts in 1820, in many instances the starting point for the framers of the Maine Constitution was the Massachusetts Declaration of Rights.[6]  That is not the case, however, with respect to article I, section 6, given that its language differs significantly from the Massachusetts Declaration.[7]

[¶16]  Instead, textual reference to a "speedy" trial appeared to originate in the Institutes of Sir Edward Coke, "read in the American Colonies by virtually every student of the law."  *Klopfer v. North Carolina*, 386 U.S. 213, 225 (1967).

---

[6] A People's Address appended to the Constitution as sent to the Maine electorate for approval stated: "Assuming that [Massachusetts] instrument for a basis, the convention proceeded to frame a Constitution for the State of Maine, deviating in those cases only, where experience of this and of other States in the Union seemed to justify and require it."  Address, *reprinted in* Debates and Journal of the Constitutional Convention of the State of Maine (1819–20) pt. 3, at 106 (1894).

[7] The Massachusetts Declaration of Rights did not (and does not) have a speedy trial provision per se; instead, the right has been read into its remedies provision, which provides: "Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character.  He ought to obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws."  Mass. Const. pt. 1, art. XI; *see also Commonwealth v. Hanley*, 149 N.E.2d 608, 610 (Mass. 1958).

The term was then incorporated into the first state constitution in Virginia in 1776, other pre-1820 state constitutions, and the Sixth Amendment. *See* Va. Const. art. I, § 8; *Klopfer*, 386 U.S. at 225-26; *Fowlkes v. Commonwealth*, 240 S.E.2d 662, 663 n.2 (Va. 1978); *In re Provoo*, 17 F.R.D. 183, 196-98 (D. Md. 1955).

[¶17]  None of these pre-1820 authorities to which the Maine framers and ratifiers may have been exposed, however, provide further detail relevant to the issues present in the instant case. *Cf. United States v. Olsen*, 21 F.4th 1036, 1061 (9th Cir. 2022) ("[S]urprisingly few Founding era cases illuminate the full meaning and scope of the speedy trial right."). Nor are any specifics beyond the naked reference to a "speedy" trial provided in the text of the Maine Constitution itself. The indefinite nature of the constitutional text allows it to remain viable as circumstances change over time. *Cf. Allen v. Quinn*, 459 A.2d 1098, 1102 (Me. 1983) ("Constitutional provisions are accorded a liberal interpretation in order to carry out their broad purpose, because they are expected to last over time and are cumbersome to amend.").

[¶18]  Hence, we must go beyond the plain language of article I, section 6 to divine the test that measures whether a violation of the right to a speedy trial has occurred.

**2.    Historical context reflects that pretrial delay was a motivating factor in Maine's separation from Massachusetts and that multiple concerns animated the framers.**

[¶19]    Not only was article I, section 6 not derived from the Massachusetts Declaration, but one factor motivating Maine's separation from the Commonwealth was long delay in obtaining trials.  The Massachusetts courts operated in only some of Maine's counties, and typically no more than once per year.  *See* Daniel Davis, An Address to the Inhabitants of the District of Maine Upon the Subject of their Separation from the Present Government of Massachusetts by One of Their Fellow Citizens, 16 (Apr. 1791), https://www.mainememory.net/media/pdf/103653.pdf  [hereinafter Davis Address].  The result was lengthy pretrial confinement.  *See id.* at 17-18 ("It is not an unusual thing, for persons to be confined in the jails, at the public[] expense, for nine or ten months together, waiting for nothing but the return of the Supreme Judicial court, to give them their trial.").

[¶20]  Frustration with pretrial confinement was recorded in the 1819 Articles of Separation, where lawmakers specifically established that "all actions, suits, and causes . . . shall be . . . heard, tried and determined in the highest court of law . . . at the first term of such court."  Articles of Separation § 7, *reprinted in* Debates and Journal of the Constitutional Convention of the

State of Maine (1819-20) pt. 3, at 13 (1894). Importantly, however, the Constitution drafted later that year dropped this strict deadline, instead opting for the more flexible language contained in article I, section 6.

[¶21] The Maine framers left little legislative history to aid in interpretation of article I, section 6. Early materials suggest four reasons for the speedy trial guarantee: (1) allowing those accused to clear their names quickly, Op. Me. Att'y Gen. (1860), *reprinted in* 1859-1870 Me. Att'y Gen. Ann. Rep. 4, (2) increasing the probability of a just outcome by preventing witnesses from dying or losing their memories, *id.*, (3) dissuading crime and legitimizing the legal system by providing timely punishment, *see* 1823 Me. Laws 197, 206-08 (Message of the Governor of the State of Maine to Both Branches of the Legislature, 3d Legis.), and (4) minimizing the cost of pretrial incarceration, Davis Address, *supra* ¶ 19, at 18-19.

> **3.** **The right to a speedy trial has been protected by statute or by a rule of criminal procedure since Maine became a state.**

[¶22] Immediately after Maine became a state, the Maine Legislature enacted a statute that provided speedy trial rights to criminal defendants. *See* P.L. 1821, ch. 59, § 44. The statute contained two key components: the accused had to assert the right to a speedy trial; and once the right was asserted, the accused had to be bailed, tried, or discharged within the current or second

term of the return of the accused's indictment.[8]  The statute remained largely

unchanged until 1965.[9]

[¶23]  In 1965, the term approach to the court calendar was eliminated.

*See* P.L. 1965, ch. 356, § 43.  The statute measuring the time for trial by term

was replaced by Rule 48 of the Maine Rules of Criminal Procedure, which

measured—and continues to measure—the relevant time by "unnecessary

delay."[10]  M.R. Crim. P. 48(b) (1965) (repealed 2015), available at 161 Me. 606

---

[8]  *See State v. O'Clair*, 292 A.2d 186, 191-92 (Me. 1972).  The original text of the first statute, enacted in 1821, provided:

> [W]hen any person shall be held in prison under indictment, he shall be tried or bailed at the first term next after his indictment, if he demands the same, unless it shall appear to the Court that the witnesses, on behalf of the government, have either been enticed away or are detained by some inevitable accident from attending.  And all persons under indictment for felony shall be bailed or tried at the second term after the bill shall be returned, if they demand it.

P.L. 1821, ch. 59, § 44.  The language used in the statute appears to be based on the Habeas Corpus Act of 1679.  *See* Habeas Corpus Act 1679, 31 Car. 2 c. 2.

[9] *See* P.L. 1821, ch. 59, § 44; R.S. ch. 172, §§ 12-15 (1841); R.S. ch. 134, §§ 9-10 (1857); R.S. ch. 134, §§ 9-10 (1871); R.S. ch. 134, §§ 9-10 (1883); R.S. ch. 135, §§ 9-10 (1903); R.S. ch. 136, §§ 10-11 (1916); R.S. ch. 146, §§ 10-11 (1930); R.S. ch. 135, §§ 8-9 (1944); R.S. ch. 148, §§ 8-9 (1954); 15 M.R.S. § 1201 (1964).  In 1871, the statute was amended to include the following language: "Any person indicted, although he has not been arrested, is entitled to a speedy trial, if he demands it, in person, in open court."  R.S. ch. 134, § 10 (1871).

[10]  The rule currently provides: "If there is unnecessary delay in bringing a defendant to trial, the court may upon motion of the defendant or on the court's own motion dismiss the indictment, information, or complaint.  The court shall direct whether the dismissal is with or without prejudice."  M.R.U. Crim. P. 48(b)(1).  The last sentence of Rule 48(b)(1) was added in 1983 in response to our ruling in *State v. Wells*, 443 A.2d 60, 63-64 (Me. 1982), in which we explained how, in addition to dismissal based on a constitutional speedy trial violation, the court retains the power to dismiss an indictment with or without prejudice for a prosecutor's failure to pursue a case with due diligence. *See State v. Eaton*, 462 A.2d 502, 504 n.6 (Me. 1983); *see also Wells*, 443 A.2d at 63-64 ("The purpose

(1965); *see* M.R.U. Crim. P. 48(b)(1); *State v. O'Clair*, 292 A.2d 186, 192 (Me. 1972) (stating that the change from specific statutory time limits to "the more flexible standard of 'unnecessary delay'" "manifests . . . a desire to substitute for the former definite term limitations a formula adaptable to a judicial system respecting which the existence or expiration of terms of court as such was meant to be phased out").

### 4. Sociological considerations favor a dynamic construction of article I, section 6.

[¶24]  Our Constitution is "a live and flexible instrument fully capable of meeting and serving the imperative needs of society in a changing world*." Opinion of the Justices*, 231 A.2d 431, 434 (Me. 1967).  Analysis of the scope of a constitutional protection can require consideration of the "public policy for the State of Maine and the appropriate resolution of the values we find at stake." *State v. Rees*, 2000 ME 55, ¶ 8, 748 A.2d 976 (alteration and quotation marks omitted).

### 5. Precedent supports the use of a flexible, multi-factor test.

[¶25]  As an overarching principle, we have repeated many times that the constitutional standard for a speedy trial is flexible, and the application of the

---

of the rule ensures not only a criminal defendant's *constitutional* right to a speedy trial, but also furthers important judicial policy considerations of relief of trial court congestion, prompt processing of all cases reaching the courts and advancement of the efficiency of the criminal justice process.").

standard is dependent on the unique circumstances of each case.[11]  There are several factors that we have concluded are relevant to this flexible analysis.

### a.    Length of the delay

[¶26]  The first factor "is the actual length of the delay."  *State v. Cadman*, 476 A.2d 1148, 1150 (Me. 1984).  There will always be some delay between the inception of a criminal charge and the trial.  The ordinary delay associated with the criminal justice process does not result in a speedy trial violation, and an accused cannot make a successful speedy trial claim where the delay is limited in duration unless they point to "additional circumstances."  *See id.* at 1150-51.  Even when a delay extends beyond what we would ordinarily expect and becomes "conspicuously excessive," the State may show that no violation occurred by pointing to mitigating factors.  *See id.*

[¶27]   Depending on factors such as the complexity and number of charges a defendant is facing, delay can be essential to the defendant's ability to mount a defense.  *See, e.g.*, *O'Clair*, 292 A.2d at 192-93 (holding that no speedy trial violation occurred despite a twelve-month delay because the defendant

---

[11] *See State v. Couture*, 156 Me. 231, 245, 163 A.2d 646 (1960); *O'Clair*, 292 A.2d at 192; *State v. Bessey*, 328 A.2d 807, 816-18 (Me. 1974); *State v. Cadman*, 476 A.2d 1148, 1150 (Me. 1984); *State v. Murphy*, 496 A.2d 623, 627 (Me. 1985); *cf. Barker v. Wingo*, 407 U.S. 514, 521 (1972) ("Finally, . . . the right to speedy trial is a more vague concept than other procedural rights.  It is . . . impossible to determine with precision when the right has been denied.  We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate.").

had requested a delay in order to secure defense witnesses). Accordingly, we have not decided whether it is possible to pinpoint a bright-line duration of delay as always conspicuously excessive; nor have we determined any period of delay as sufficient to trigger a speedy trial analysis in the first place. Thus, while length of delay is an important starting point, we have consistently looked to other factors, discussed below, in determining whether a defendant's speedy trial right has been violated.

### b. Reasons for the delay

[¶28] Our speedy trial analysis weighs the reasons for the delay and whether the delays are attributable to the accused or to the State. *See Cadman*, 476 A.2d at 1150-52 (affirming the rejection of a speedy trial claim because, inter alia, we were "left to speculate as to what caused the delay and as to whether it was a normal or an exceptional circumstance"); *State v. Hale*, 157 Me. 361, 369, 172 A.2d 631 (1961) (holding that a defendant could not assert a speedy trial violation for delays accrued while they were a fugitive from justice and in another state); *State v. Rastrom*, 261 A.2d 245, 246 (Me. 1970) ("Courts . . . have not hesitated to take account of the fact that delay is solely the fault of a respondent.").

### c. Assertion of the right

[¶29]  Our precedent contains adamant language that the accused must assert the right to a speedy trial.[12]  The importance of this factor is reflected in both the early statutory language, *see supra* n.8, and the fact that the common law source of constitutional speedy trial provisions also required assertion of the right.  *See O'Clair*, 292 A.2d at 191 (noting that the Habeas Corpus Act of 1679 "provided that persons jailed for felonies or treason be brought to trial *upon their own motion* within two terms of court").  Given the weight of this factor under the Maine Constitution, in the context of an ineffective assistance claim, we must look not only to whether the defendant *actually* asserted the right to a speedy trial but also to whether the defendant *attempted* to assert the right to a speedy trial.  *Cf. Brown v. Romanowski*, 845 F.3d 703, 716 (6th Cir. 2017) (holding that the accused's failure to assert the right to a speedy trial

---

[12] *See, e.g., State v. Kopelow*, 126 Me. 384, 386, 138 A. 625 ("[T]he right of the accused to have a speedy trial may be waived by his own conduct.  He must claim his right if he wishes for its protection.  If he does not make a demand for trial, he will not be in a position to demand a discharge because of delay in prosecution." (citation omitted)); *State v. Boynton*, 143 Me. 313, 323, 62 A.2d 182 (1948) ("The constitutional right to a speedy trial is a personal privilege granted to the accused and not a limitation upon the power of the state to prosecute for crime.  It is a privilege that he may waive."); *State v. Harriman*, 259 A.2d 752, 755 (Me. 1969) ("The right [to a speedy trial] may be waived by the accused's failure to assert it."); *State v. Slorah*, 118 Me. 203, 207, 106 A. 768 (1919) (holding that "silence on the part of the respondent" does not "constitute a demand for trial or a request for bail").

"cannot count against him . . . when he was represented by incompetent counsel").

### d. Prejudice

[¶30] The last factor assessed is the prejudice to the defendant caused by the delay. *See Cadman*, 476 A.2d at 1151. We have previously identified three harms that the right to a speedy trial seeks to prevent: (1) undue and oppressive incarceration prior to trial; (2) the accused's anxiety and concern accompanying public accusation, and (3) impairment of the accused's ability to mount a defense. *See State v. Brann*, 292 A.2d 173, 184 & n.14 (Me. 1972); *see also supra* ¶ 21 (noting the interests of an accused to clear their name and to reduce the chance of losing evidence).

[¶31] The first of these three harms, oppressive pretrial incarceration, has been viewed in Maine as particularly significant, as reflected by language in our early statute providing protection to "[a]ny person in prison under indictment." 15 M.R.S. § 1201 (1964).

### 6. The test under the Maine Constitution is similar but not identical to the federal test.

[¶32] The four factors examined under the Maine Constitution are the same as the factors addressed under the Sixth Amendment. *See Barker*, 407 U.S. at 530; *State v. Murphy*, 496 A.2d 623, 627 (Me. 1985) (noting that the

four-factor test is applied under both our state and federal constitutions). This confluence of the state and federal tests is not surprising. These four factors are the relevant considerations as a matter of logic. They are the factors examined, with few exceptions, by other state courts under their own constitutions.[13] Neither party has suggested they are not the right factors for us to review under the Maine Constitution.

[¶33] Instead, differences in the test among jurisdictions lie in nuances in the application of these four factors.[14] One nuanced difference between the federal and Maine tests is that a failure to assert the right can be determinative under the Maine Constitution but not under the United States Constitution. *Compare State v. Kopelow*, 126 Me. 384, 386, 138 A. 625 (1927) ("If [the

---

[13] *See, e.g.*, *State v. Gutierrez-Fuentes*, 508 P.3d 378, 383 (Kan. 2022) ("[I]n terms of a defendant's constitutional speedy trial right, neither the United States nor the Kansas Constitutions impose specific time requirements for bringing a criminal defendant to trial, which is why courts utilize the constitutional balancing test of the *Barker* factors."); *Glover v. State*, 792 A.2d 1160, 1166 (Md. 2002) ("We consistently have applied the *Barker* factors when considering alleged violations of both the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights."); *State v. Wright*, 404 P.3d 166, 178 (Alaska 2017) ("We agree that [the *Barker*] test presents an appropriate analytical structure for evaluating speedy trial claims brought under the Alaska Constitution."); *State v. Alkire*, 468 P.3d 87, 99-100 (Haw. 2020) ("This court applies the four-part test set forth by the United States Supreme Court in *Barker* . . . to determine whether the government has violated a defendant's federal and state constitutional rights to a speedy trial."); *State v. Iniguez*, 217 P.3d 768, 776 (Wash. 2009) (holding that the Washington Constitution's speedy trial provision "requires a method of analysis substantially the same as the federal Sixth Amendment analysis and does not afford a defendant greater speedy trial rights").

[14] For example, New Hampshire courts apply *Barker* but "place particular emphasis" on the defendant's assertion of the right and prejudice to the defendant. *See, e.g.*, *State v. Little*, 435 A.2d 517, 521 (N.H. 1981).

accused] does not make a demand for trial, he will not be in a position to demand a discharge because of delay in prosecution."), *with Barker*, 407 U.S. at 528 ("We reject . . . the rule that a defendant who fails to demand a speedy trial forever waives his right."). Also, as noted above, *see supra* ¶ 22, if a delay is excessive under the Maine Constitution, the remedy at least in some instances might not be dismissal of the charges, but release from incarceration.

[¶34] One nuance that certain amici seek relates to the last factor, prejudice. They effectively advocate a bright-line, one-year measure for establishing prejudice, given, among other things, the practical difficulty of proving actual prejudice caused by dissipation of evidence over time. In support of their position, they point to Maine's early statutes requiring trials to be held over only to a second term, which, as a practical matter, amounted to no longer than a year.

[¶35] But as noted above, *see supra* ¶ 20, no such bright line was incorporated into the Maine Constitution itself. *See also State v. Bessey*, 328 A.2d 807, 818 (Me. 1974) ("[T]he mere lapse of time will not per se establish a denial of speedy trial."). While bright lines can be helpful, they are more

appropriately set by legislatures, not courts.[15]  We have repeated many times that each speedy trial claim is fact-sensitive, and any specific time limit we would propose would be arbitrary, finding little support as a constitutional mandate in text, history, or precedent.

[¶36]  Presumptions, although less concrete, can also be helpful, and the federal test includes a presumption.  *See United States v. Carpenter*, 781 F.3d 599, 610 (1st Cir. 2015) ("Delay of around one year is considered presumptively prejudicial . . . .").[16]

[¶37]  But again, while potentially helpful, presumptions are not constitutionally compelled.  If, for example, we established a presumption that triggered analysis of the other factors at X months and we shifted burdens of proof at Y months, the basis for concluding that X and Y are *constitutionally* demanded bright lines is not apparent such that the Legislature could not adopt different deadlines by statute.  *Cf. Thornton Acad. v. Reg'l Sch. Unit 21*, 2019 ME 115, ¶ 16, 212 A.3d 340 ("[T]he Legislature's determination of public policy is

---

[15]  Congress, for example, enacted the Speedy Trial Act, 18 U.S.C.S. §§ 3161-3174 (LEXIS through Pub. L. 117-327), shortly after the Supreme Court announced the admittedly "vague" test in *Barker*, 407 U.S. at 521, 530-33.

[16]  Even the amici arguing for a one-year standard do not propose that dismissal would be automatic after this length of time.  Instead, they argue in favor of the standard as excusing the defendant from having to show prejudice and requiring dismissal absent proof, with the burden on the State, that the delay was caused by the defendant.  This proposal is not appreciably different from the federal test.

24

binding on the courts so long as it is within constitutional limits." (quotation marks omitted)).

[¶38]  Past experience underscores this conclusion.  In *State v. Couture*, 156 Me. 231, 247-48, 163 A.2d 646 (1960), we appeared to suggest that a delay of eight months was presumptively prejudicial.  We later had to clarify that our discussion in *Couture* had been misconstrued and was mere dictum.  *See Brann*, 292 A.2d at 180-84.[17]

[¶39]  In sum, while we agree that specificity can be beneficial when set by the Legislature, these specifics are not embedded in the Maine Constitution, and we are unable to impose any bright-line rules.  Article I, section 6 is not designed for specific, bright-line rules, and was instead intended to be sufficiently flexible so as to apply as circumstances change.

---

[17]  The experience in Montana is also instructive.  In *City of Billings v. Bruce*, 965 P.2d 866, 877-78 (Mont. 1998), the Montana Supreme Court, dissatisfied with the apparent inconsistent results and lack of specificity in the application of the *Barker* test nationwide, articulated a more structured method for applying the four factors, incorporating bright-line criteria.  After less than a decade of applying this test, the Montana Supreme Court concluded that its test needed revision to "more closely track[ ]" the balancing approach in *Barker*.  *State v. Ariegwe*, 167 P.3d 815, 847 (Mont. 2007).  Justice Rice, concurring in this revised test, which is extremely detailed, "bemoan[ed] the law's complexity."  *Id.* at 864 (Rice, J., concurring); *see also* Myles Braccio & Jessie Lundberg, Note, *"The Mother of All Balancing Tests":* State v. Ariegwe *and Montana's Revised Speedy Trial Analysis*, 69 Mont. L. Rev. 463 (2008) (criticizing the revised Montana test).

**D.    Applying the test under the Maine Constitution, a remand is required.** [18]

[¶40]  We now turn to the PCR court's analysis and whether it complied with the principles we have set forth above.

### 1.    The lengths of the delays were substantial.

[¶41]  The six charges involve different periods of delay ranging from thirty-three to forty-two months.[19]

[¶42]  We first note that Maine precedent should have alerted reasonable counsel to consider how best to protect Winchester's right to a speedy trial after roughly one year of delay.  *Compare State v. Mahaney*, 437 A.2d 613, 620 (Me. 1981) (concluding an eight-month delay was not presumptively

---

[18] One reason we sought supplemental briefing is the lack of clarity in our precedent as to the test applied under article I, section 6.  *See* Tinkle, *The Maine State Constitution* 40 (2d ed. 2013) (noting that the status of the right to a speedy trial in Maine is "in flux" and that "it is questionable whether this provision retains any independent jural significance today").  Had we concluded that the test under our Constitution differed in material respect from the *Barker* test relevant to Winchester's situation, we would then have had to address in the instant case whether, given the previous lack of clarity, Winchester's attorneys could be deemed deficient in performance if they only assessed the merits of his speedy trial claim applying the federal *Barker* test.  But the two tests are sufficiently similar, and their differences are largely immaterial for the purposes of determining whether Winchester was deprived of effective assistance of counsel.

[19] At oral argument, Winchester asserted that the clock for measuring the period of delay begins upon indictment.  If the defendant becomes formally accused prior to the date of the indictment, however, then the clock begins at the earlier date.  *See State v. Harper*, 613 A.2d 945, 946 n.1 (Me. 1992) ("[W]hen . . . the arrest and incarceration of [the] defendant precedes [their] formal indictment, the date of arrest begins the delay period."); *United States v. Marion,* 404 U.S. 307, 325 (1971) (calculating the period of delay from the date of indictment because "neither [defendant] was arrested, charged, or otherwise subjected to formal restraint prior to indictment").  Here, Winchester was incarcerated and charged by complaint prior to being indicted in four of the cases.  *See supra* n.1.  The time periods between when Winchester was charged and when he was indicted in these four cases are not significant, and the total periods of delay between initial charge and resolution in the six cases range from thirty-three months to forty-two months.  *See supra* ¶ 3.

prejudicial applying the *Barker* test), *with State v. Willoughby*, 507 A.2d 1060, 1065 (Me. 1986) (concluding that a fourteen-month delay was sufficient to trigger review under *Barker*).

[¶43] Analyzing this factor further, it is relevant that the charges against Winchester did not involve complex matters. *Cf. Barker*, 407 U.S. at 531 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."). That said, it is also relevant that each case, supported by individual PCR petitions, must be analyzed on its own, particularly because these six separate cases could not be brought to trial simultaneously. There is no indication in the record that Winchester would have waived his right to trial by jury or agreed to consolidate the cases for trial. In fact, to avoid tainting a jury pool, only one of Winchester's cases at a time ordinarily could have been scheduled for jury selection.

[¶44] The PCR court here determined that the delay was not so significant as to cause a per se violation of Winchester's right to a speedy trial, but that it was long enough to "warrant consideration of the three remaining factors in the balancing process." Because the court did not find the length of delay to be determinative and incorporated it into a larger analysis of

Winchester's claim, the court did not err in its application of the first factor in the speedy trial balancing test.

**2.    The reasons for the delays require further inquiry on remand.**

[¶45]   On direct appeal, periods of delay occasioned by the accused should not be counted against the State, *see State v. Spearin*, 477 A.2d 1147, 1154 (Me. 1984), but other delays—both those caused by the State and those attributable to court delays and backlogs—should be counted against the State. *Cf. Cadman*, 476 A.2d at 1151-52.  Courts should assign each delay a different weight, depending on the type of delay.  Delay caused by the State with the intent to prejudice the defense receives the most substantial weight favoring the defendant in the analysis.  *Cf. Barker*, 407 U.S. at 531 ("A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.").  Although still attributable to the State, delays over which prosecutors and courts have little or no control are given less weight.  *Cf. Cadman*, 476 A.2d at 1152 (holding that a crowded docket "may be weighed less heavily against the State than, for example, a deliberate attempt to hamper the defense").

[¶46]  The PCR court cited numerous reasons for the roughly three-year delay in each of the six cases.  The PCR court found that the largest single delay

in all six cases was attributable to the motions to suppress. When Attorney Prendergast was appointed several weeks after Attorney Plourde's departure, nearly eleven months had passed from the initiation of the earliest of the six cases. Three months into his appointment, Prendergast filed motions to suppress in each of the six cases. The PCR court noted that it did "not know why these motions took 15 months to be resolved and agree[d] that [it] seems excessive."

[¶47] The PCR court concluded that this unexplained delay could not be attributed to the State. Because delays caused by the court are attributable to the State, this conclusion constituted legal error. *See Cadman*, 476 A.2d at 1151-52. The delay beyond what would have been reasonable must be weighed against the State, at least to some extent. It is primarily because the PCR court did not give any weight to what it determined was the most significant portion of the overall delay that we vacate and remand.

[¶48] On remand, the court should consider whether any portion of the delay caused by the motions to suppress is attributable to counsel's reasonable defense strategy. *See O'Clair* 292 A.2d at 192-93 (attributing a period of delay to the defendant who "demonstrated that he was not ready for trial as he was requesting a postponement of the trial date for the purpose of securing certain

defense witnesses"). Here, the PCR court stated that the fifteen-month delay on ruling on the motion to suppress "seem[ed] excessive" and was unexplained. We defer to these findings of the PCR court. On remand, the court should examine whether counsel's failure to prompt a ruling on the motion to suppress and pursue Winchester's speedy trial rights formed part of a reasonable trial strategy.

[¶49] Similarly, the PCR court may consider what portion of the *total* delay was caused by Winchester's counsel's reasonable strategies. For example, the record indicates that at least some of the delay may have been occasioned by Winchester's counsel's strategy to receive independent analysis of the State's DNA evidence and to "try and essentially get all of the State's evidence thrown out on all of [the] cases." With respect to the DNA analysis, Attorney Prendergast testified that he had asked for independent analysis of the DNA results, but it is unclear when this independent analysis was completed or what portion of the total delay was due to the independent analysis. Thus, the court should consider the extent to which the existence of DNA evidence can excuse any portion of the total delay and whether any delay attributable to obtaining a DNA analysis could justify a delay in bringing the other cases to trial. *See Glover v. State*, 792 A.2d 1160, 1169 (Md. 2002)

("[W]hile minor delays in obtaining DNA evidence will not be weighed heavily against the State, nor against a defendant seeking his or her own DNA analysis, delays likely will not be tolerated upon clear demonstrations of a failure to monitor or aggressively pursue the attainment of these results.").

[¶50] On remand, the court may also consider the time it took the court to reschedule the trial in Docket No. CR-2015-067, when the originally scheduled trial was cancelled due to a snowstorm. The trial was never held, with Winchester pleading nolo contendere nine months later. The unexplained delay in rescheduling the trial is also attributable to the State, albeit with limited weight, but the PCR court failed to mention or discuss this delay in its decision.

[¶51] Finally, the PCR court may also reconsider its evaluation of the delay caused by Winchester's various changes in counsel. *See State v. McLaughlin*, 567 A.2d 82, 83 (Me. 1989). The record reflects that approximately six months could potentially be attributed to changes in counsel and would thus not be attributable to the State.[20] This delay may or may not be significant given that it was relatively short and because, as the record suggests, the cause of the

---

[20] It took Attorney Prendergast three months after his appointment to file a second set of motions to suppress in all six cases, with Attorney Coleman taking a similar amount of time to prepare a motion for further findings of fact and conclusions of law, which Attorney Tebbetts filed upon his appointment.

attorney turnover may or may not have been prompted by Winchester's dissatisfaction with his counsel's failure to pursue his right to a speedy trial. On remand, the court should consider whether such an inference can be drawn.

### 3. In this ineffective assistance context, the proper inquiry is whether Winchester personally attempted to assert his right to a speedy trial.

[¶52]  As noted above, *see supra* ¶ 29, whether a defendant has asserted their right to a speedy trial can be critical under article I, section 6.  Here, the PCR court determined that "no request for speedy trial was made."[21]  As the PCR court also found, however, on April 12, 2015, Winchester inquired of the clerk's office whether his first attorney, Plourde, had filed a speedy trial motion, and Winchester was erroneously told that Plourde had done so.  Winchester testified in the PCR hearing that he told Attorney Prendergast to advance the speedy trial issue,[22] and Prendergast did not contradict Winchester's

---

[21] Attorney Tebbetts testified that he orally moved to dismiss Docket No. CR-2014-545 for lack of a speedy trial on the morning of the trial in that case, but the trial court denied the motion, stating that changes in counsel and pretrial litigation had been the primary cause of delay.  The docket, however, does not reflect that the oral motion was ever made; nor does it reflect the court's denial of an oral motion.  Tebbetts's oral motion—to the extent it can be considered in an analysis of Winchester's speedy trial claim—would have been filed only in one docket, and the belated nature of the motion would limit its impact on the speedy trial analysis.  *See State v. Hider*, 1998 ME 203, ¶¶ 15-21, 715 A.2d 942 (holding that the defendant was "late in asserting his right to a speedy trial" when, in the context of a nineteen-month delay, he brought a pro se motion alleging a speedy trial violation five months before trial and another motion to dismiss for lack of a speedy trial immediately before trial).

[22] Regarding the DNA case, Winchester testified:

testimony. Winchester also testified that he raised the issue with Attorney Tebbetts, which Tebbetts confirmed in his own testimony.[23] Finally, Winchester testified that he "had been complaining to each attorney for . . . three years about a speedy trial . . . [a]nd nobody ha[d] taken steps to preserve that right." Winchester also expressly reserved his speedy trial claim when he pleaded nolo contendere.

[¶53] In short, there is record evidence that could support a finding that Winchester, while incarcerated, consistently attempted to have his appointed counsel assert his right to a speedy trial.[24] As noted above, *see supra* ¶ 29, in the context of an ineffective assistance claim, we look to whether and how the defendant *attempted* to assert their rights, not whether they actually asserted their rights. But other than determining that "no request for a speedy trial was made," the court's treatment of this factor in the overall context of its decision is unclear. Because the Court did not make a finding as to whether Winchester

---

I wanted to get this thing to trial and get it taken care of. This is one charge where they had taken my bail from me and were holding me without bail. . . . I asked [Attorney Prendergast] to get me a bail on this or get this addressed. . . . He's never filed any motion for—to—to proceed with this, never protected my rights on putting this to a speedy trial, never filed any motions or any litigation to bring this to an end.

[23] Tebbetts testified that the speedy trial issue was "[e]xtremely important" to Winchester.

[24] While the PCR court found Winchester "less than credible or reliable when discussing his perceived failures by his attorneys," it is unclear whether the court found Winchester's testimony credible on the specific issue of whether Winchester attempted to assert his right to a speedy trial. As noted above, his counsel corroborated at least some aspects of his testimony on this point.

personally tried to assert his right to speedy trial, and because it is his attempt to do so that is the relevant consideration in this context, on remand, the court should make a finding on this issue to determine the viability of Winchester's claim.

### 4. On remand, the prejudice inquiry should focus on the harms that the right to a speedy trial is designed to prevent.

[¶54]  The final factor is prejudice to the defendant.  *See Cadman*, 476 A.2d at 1151.  In his briefs, Winchester does argue that he suffered actual prejudice through, for example, proof of the loss of witness availability.  Such a showing, however, is not a "necessary or sufficient condition to the finding of a deprivation of the right of speedy trial."  *Barker*, 407 U.S. at 533.  As noted above, we eschew bright lines but instead note that "[t]he longer the delay, the greater the presumptive or actual prejudice to the [accused] in terms of [their] ability to prepare for trial and the restrictions on [their] liberty."  *Cf. United States v. Taylor*, 487 U.S. 326, 340 (1988).

[¶55]  The PCR court's prejudice analysis focused heavily on the length of delay and the reasons for delay.  While each of the four factors of the speedy trial analysis impact one another, the PCR court effectively subsumed its prejudice analysis into its analysis of the other factors.  On remand, the PCR court should instead anchor its prejudice analysis on the three harms the

34

speedy trial right is designed to prevent: (1) undue and oppressive incarceration prior to trial; (2) anxiety and concern accompanying public accusation; and (3) impairment of the accused's ability to mount a defense. *See Brann*, 292 A.2d at 184 & n.14.

[¶56]  Given the history of Maine's speedy trial provision, Winchester's pretrial incarceration must be closely scrutinized on remand.[25]  *See supra* ¶ 19. Looking to the consideration given to this component of the prejudice factor in federal jurisprudence, which we find persuasive, not only is pretrial incarceration a harm in itself but, when a defendant awaits trial while incarcerated, even on an unrelated charge, the danger of prejudice is heightened.  *Cf. Smith v. Hooey*, 393 U.S. 374, 379-80 (1969) (explaining that the accused's ability to defend himself while incarcerated is hampered because "his ability to confer with potential defense witnesses, or even to keep track of their whereabouts, is obviously impaired").  When the accused is already in prison, the interest in minimizing anxiety and concern associated with a public accusation may be heightened because the additional accusation threatens the

---

[25] Winchester was returned to jail upon his release from his 2015 prison sentence due to a motion to revoke bail in the DNA case, which had not yet come to trial by the time of his release.  Winchester also testified that because he was on a bail hold while serving the three-year sentence in the earlier case, the failure to seek a speedy trial in that case also deprived him of a "minimum security" classification in prison.

prospect of rehabilitation. *See Strunk v. United States*, 412 U.S. 434, 439 (1973) ("We recognize . . . that the stress from a delayed trial may be less on a prisoner already confined, whose family ties and employment have been interrupted, but other factors such as the prospect of rehabilitation may also be affected adversely." (footnote omitted)); *Hooey*, 393 U.S. at 379 ("The strain of having to serve a sentence with the uncertain prospect of being taken into the custody of another state at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities.").

[¶57]  On the other hand, much of Winchester's pretrial incarceration during the relevant period was due to his being held without bail in the DNA case.  There is federal authority for the proposition that the accused's incarceration due to a bail violation negates any claim of prejudice due to incarceration in the context of a speedy trial claim. *See United States v. McGhee,* 532 F.3d 733, 740 (8th Cir. 2008) ("Although incarcerated before trial, [the accused] was incarcerated only because the magistrate judge revoked his release after failing a drug test and lying under oath.  Any prejudice from pretrial incarceration was attributable to [the accused's] own acts.").

[¶58]  We conclude that under the Maine test, because incarceration can impede the accused's ability to prepare a defense and cooperate with counsel,

36

Winchester's responsibility for his incarceration diminishes but does not eliminate its weight in the analysis of prejudice. On remand, the PCR court must consider each of these issues and determine the extent to which Winchester was prejudiced by the delay.

## III. CONCLUSION

[¶59] Whether the right to a speedy trial has been violated is a fact-sensitive inquiry, to be weighed in light of all relevant circumstances.[26] Because the PCR court utilized a faulty analysis to conclude there was no merit to the speedy trial claim, it did not analyze counsel's strategy in failing to assert Winchester's right to a speedy trial at any stage of the proceedings. Although the primary reason for our remand is because the court gave no weight at all to what it termed the "excessive" delay in addressing Winchester's motions to suppress, the court, in its reconsideration, should weigh all relevant facts relating to the number and nature of Winchester's cases, the actions of Winchester's counsel and Winchester himself, and the ordinary delays associated with the Aroostook County Unified Criminal Docket's operations.

---

[26] We express no opinion as to the impact of any delays attributable to a pandemic. *See, e.g.*, *Ali v. Commonwealth*, 872 S.E.2d 662, 676 & n.14 (Va. Ct. App. 2022) (collecting cases excepting delays related to the COVID-19 pandemic).

The entry is:

> Judgment vacated. Remanded for further proceedings consistent with this opinion.

---

Lawrence C. Winger, Esq. (orally), Portland, for appellant Dennis F. Winchester

Todd R. Collins, District Attorney, 8th Prosecutorial District, Caribou, for appellee State of Maine

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for amicus curiae, Office of the Attorney General

Carol Garvan, Esq. (orally), Zachary L. Heiden, Esq., and Anahita Sotoohi, Esq., American Civil Liberties Union of Maine Foundation, Portland, for amicus curiae American Civil Liberties Union of Maine

Jamesa J. Drake, Esq., Drake Law LLC, Auburn and Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for amicus curiae Maine Commission on Indigent Legal Services

Zachary J. Smith, amicus curiae pro se

Aroostook County Unified Criminal Docket docket numbers CR-2019-129, -130, -131, -132, -133, and -134
FOR CLERK REFERENCE ONLY