MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2025 ME 83
Docket:        Ken-24-125
Argued:        December 10, 2024
Decided:       August 26, 2025

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

AARON C. ENGROFF

HORTON, J.

[¶1]  Aaron C. Engroff appeals from a judgment of conviction for two counts of unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1) (2025), and one count of unlawful sexual touching (Class D), 17-A M.R.S. § 260(1)(C) (2025), entered by the trial court (Kennebec County, *Murphy, J.)* after a jury verdict.[1]  Engroff argues that the court erred by denying his motion to dismiss, in which he asserted a speedy trial violation.  He further argues that the admission in evidence of a video interview of the victim violated his rights under the Maine Confrontation Clause and Maine Due Process Clause, *see* Me. Const. art. I, §§ 6, 6-A, and that the statute authorizing admission of the video,

---

[1] Although the statutes were each amended multiple times after the date of the charged crimes, those amendments do not impact this appeal.  *See, e.g.*, P.L. 2023, ch. 280, §§ 3, 4 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 255-A(1)(A), (B) (2025)); P.L. 2023, ch. 280, § 5 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 260(1)(A) (2025)).

2

16 M.R.S. § 358 (2024),[2] did not apply to his case. We disagree that Engroff's speedy trial right was violated. We also disagree that the admission of the video interview violated the Maine Confrontation Clause or the Maine Due Process Clause. Although we agree with Engroff that section 358 in its original form did not apply to cases pending as of its enactment, including Engroff's case, we affirm the judgment because the Legislature has since amended the statute to apply to Engroff's case.

## I. BACKGROUND

[¶2] "Viewing the evidence admitted at trial in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt." *State v. Athayde*, 2022 ME 41, ¶ 2, 277 A.3d 387.

[¶3] The victim, who was born in 2010, is Engroff's niece by marriage. Engroff's home in Holden often served as a venue for family gatherings. The gatherings at Engroff's home continued after he and his wife moved to West Gardiner in 2019. The victim and her grandmother sometimes stayed overnight with Engroff and his wife.

---

[2] Unless otherwise indicated, we cite the 2024 Maine Revised Statutes version of section 358, which took effect while this case was pending. *See* P.L. 2023, ch. 193, § 1 (effective Oct. 25, 2023) (codified at 16 M.R.S. § 358 (2024)). The statute was later amended. *See* P.L. 2023, ch. 646 § D-1 (emergency, effective Apr. 22, 2024) (codified at 16 M.R.S. § 358(5) (2025)). Although the amendment did not take effect until after the court entered Engroff's judgment of conviction, it is relevant to the merits of this appeal. *See infra* ¶¶ 60-62.

[¶4]  Sometime in 2020, the victim and Engroff were alone in the living room of the West Gardiner house.  The other family members had all left to go shopping.  Engroff called the victim to sit beside him.  When she complied, he put one hand under her underwear and touched her thigh and her vagina.  With his other hand, he reached into her shirt and touched her breasts.  On another occasion in 2020, the victim and Engroff were again alone in Engroff's West Gardiner home.  As the victim walked past Engroff to go to the kitchen, he stopped her.  He then put his hand inside her pants, touched her thigh, and touched her vagina, making circular motions with his fingers and rubbing up and down.

[¶5]  In January 2022, after disclosing that she had been sexually abused, the victim described the abuse in an interview with a forensic interviewer at the Children's Advocacy Center (CAC).  The interview was video recorded.

[¶6]  On March 2, 2022, the State charged Engroff by complaint with three incidents of sexual abuse.  The complaint alleged that two of the incidents occurred in West Gardiner between January 1 and December 31, 2020, and that the third incident occurred around Christmas 2020 in the home of the victim's step-great-grandmother in Augusta.  Engroff's bail conditions required him to post $1,000 in cash and prohibited unsupervised contact with minors under

4

fourteen years of age. On March 23, 2022, the grand jury returned a six-count indictment concerning the same three incidents. As to each incident, the indictment charged Engroff with unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1), and unlawful sexual touching (Class D), 17-A M.R.S. § 260(1)(C). On December 27, 2022, Engroff moved for a bill of particulars to require the State to specify the dates of the offenses alleged in the counts referring to West Gardiner. The court (*Cashman, J.*) held a hearing on the motion on February 16, 2023, and took the matter under advisement.

[¶7] On February 21, 2023, eleven months after his indictment, Engroff filed a motion for a speedy trial, asserting his rights under the United States and Maine Constitutions. *See* U.S. Const. amend. VI; Me. Const. art. I, § 6. On March 15, 2023, the court entered an order denying Engroff's motion for a bill of particulars. On April 5, 2023, Engroff waived his speedy trial right temporarily, citing his need for time to subpoena the victim's out-of-state school records.

[¶8] Engroff renewed his speedy trial demand during a June 7, 2023, docket call. At the docket call, both parties stated that they were prepared for trial, and Engroff requested "specific trial days" to enable him to subpoena out-of-state witnesses for particular dates. The court (*Lipez, J.*) noted the

request without granting it and put the case on the "blitz list"[3]—a process aimed at reducing the backlog of cases resulting from the COVID-19 pandemic—so that it could be considered for a July trial date. The court (*Cole, J.*) next held a dispositional conference on June 21, 2023, but the case was not resolved or placed on the July 2023 trial list. The court (*Murphy, J.*) held another conference on July 17, 2023, noting that the matter would not be set for September jury selection and that there was a need for an "out of state subpoena."

[¶9] On October 26, 2023, Engroff's counsel wrote to the court to reiterate his request for "specific trial dates assigned ahead of time" due to his need to "prepare out of state subpoenas that take a long time to process." On November 3, 2023, the court (*Daniel Mitchell, J.*) entered an order stating that "due to other scheduling constraints," the case would be continued to January for jury selection and that the Court could not assign a specific trial date at that time.

---

[3] The court stated that, ordinarily, the next available trial date would be in August 2023 but that a July trial could be possible for "blitz list" cases. Cases on the blitz list were expected to proceed to trial more quickly and were to be accompanied by a mandatory conference date. Engroff's conference was scheduled for June 21, 2023.

6

## A.    Engroff's Speedy Trial Motion

[¶10]  On December 21, 2023, Engroff moved to dismiss the indictment on speedy trial grounds.  *See* M.R.U. Crim. P. 48.  Basing his argument on the United States and Maine Constitutions, he argued that a violation of his right to a speedy trial had resulted from (1) the more than twenty months that had elapsed since his indictment, (2) his assertion of his speedy trial right, and (3) collateral consequences that had accumulated due to his bail conditions and the publicity given to the charges.[4]  The State objected to the motion, arguing that it was Engroff's request for specific trial days that had caused delay and that the prejudice resulting from the pendency of the charges against him was insufficient to warrant dismissal.

[¶11]  On January 5, 2024, the court (*Lipez, J.*) held a hearing on Engroff's motion to dismiss.  Neither the State nor Engroff presented any evidence.  The court made findings consistent with the procedural history above and issued an oral ruling denying Engroff's motion.  The court based its analysis on *Winchester v. State*, 2023 ME 23, 291 A.3d 707, which, the court explained, "essentially appl[ies] the same flexible multifactor test that the [Supreme]

---

[4]  Engroff, who was divorced by this time, noted that the bail conditions prohibited unsupervised visitation with his minor children.  He also stressed that, due to the charges, he was forced to leave his position at the Army National Guard and had been unsuccessful in securing a different job.

Court set forth in [*Barker v. Wingo*, 407 U.S. 514 (1972)] with some nuances." Hence, the court considered "the length of the delay, the reasons for the delay, the assertion of the right[,] and [the] prejudice to the defendant." The court found that Engroff had reasserted his right, that approximately twenty-two months had passed since the indictment, and that Engroff was responsible for the delay from February 2023 to June 2023, as well as the delay from October 2023 to January 2024. The court reasoned that Engroff was responsible for the February-to-June delay because the court conducted proceedings expeditiously while Engroff, in temporarily waiving his speedy trial right to subpoena out-of-state documents, did not. Similarly, the court reasoned that Engroff was responsible for the October-to-January delay because his October request for specific trial dates did not comport with the court's capabilities and thus further delayed the trial. Considering Engroff's contribution to the delays, the court determined that the prejudice he suffered due to his bail restrictions and the charges' publicity was insufficient to justify dismissal.

## B. Proceedings Involving the CAC Video

[¶12] On January 4, 2024, the State filed a motion in limine to allow the admission of the CAC video in evidence pursuant to 16 M.R.S. § 358. The original version of the video contained descriptions of the incidents that gave

8

rise to the charged conduct, as well as references to uncharged conduct by Engroff. Before the video was admitted at trial, the court excluded all but one of the references to uncharged conduct. *See infra* n.6.

[¶13] On January 10, the court began a three-day motion hearing to address the CAC video's admissibility. *See* 16 M.R.S. § 358(3). Engroff orally moved to exclude the video on "fairness[] and due process" grounds because section 358 was not in effect during most of the case's pendency and the State had filed its motion in limine just before jury selection.[5] The court denied Engroff's oral motion. It reasoned that because the court applies the evidentiary rules in effect at the time of the trial, because the Legislature had not limited section 358 to cases charged after a certain date, and because Engroff was aware of the contents of the video, the admission of the video would not violate his due process rights. On the same day, the court heard testimony from the forensic interviewer to determine whether the video met the requirements of section 358 for its admission in evidence. The court concluded that the video met all the statutory criteria except for two that the court determined should be addressed at the time of trial: subsection 3(G),

---

[5] In moving to exclude the video, Engroff also alluded to his right to a speedy trial. The gist of his argument was that his speedy trial demand should have resulted in the trial being held before October 2023, when section 358 came into effect.

requiring the interviewee to be available at trial for cross-examination; and subsection 3(H), requiring that the video be otherwise admissible under the Maine Rules of Evidence. *See id.* § 358(3)(G)-(H).

[¶14] On January 11, 2024, before the hearing resumed, the prosecution met with the victim to review the video, and the victim made statements that were potentially inconsistent with the account of the events that she gave in the video. These statements prompted the prosecution to send two letters to Engroff's counsel pursuant to the State's duty to disclose exculpatory information, *see Brady v. Maryland*, 373 U.S. 83, 87 (1963). In the first letter, dated January 11, 2024, the prosecution reported that the victim stated that "she did not recall one of the uncharged events that is spoken about." In the second letter, dated January 12, 2024, the prosecution explained that the victim had stated that the instance when another person almost observed Engroff engaging in the alleged act happened in West Gardiner, not in Augusta as stated in the video.

[¶15] On January 16, 2024, Engroff filed a written objection to the State's motion in limine. In the written objection, he argued, among other things, that admitting the video would violate his state and federal confrontation rights, his state and federal rights to a speedy trial, and his due process rights.

[¶16]  On January 18 and 19, the motion hearing proceeded before a different justice on other issues involving the CAC video.  The court (*Murphy. J.*) agreed in part with Engroff's objection to the portions of the CAC video referring to uncharged conduct, *see* M.R. Evid. 401, 403, 404, and ordered that the video be edited to exclude all but one of the references.[6]

## C.    The Trial

[¶17]  The court held a jury trial from January 22 to 24, 2024.  At the outset, the court dismissed one of the charges of unlawful sexual touching (Class D), 17-A M.R.S. § 260(1)(C), due to a typographical error in the indictment.  Engroff also orally renewed his objection to the admission of the CAC video based on his state and federal confrontation rights, his due process rights, and his right to a speedy trial.

[¶18]  The State presented testimony from the forensic interviewer, the victim, the principal investigator, and family members of the victim.  The court admitted four of Engroff's exhibits[7] and the State's CAC video.  The video was played for the jury after the interviewer testified.  The video depicts the victim

---

[6] The instance of uncharged conduct that the court did not exclude involved an incident that the State contended marked the starting point of Engroff's sexual abuse of the victim.

[7] The court admitted a deed of Engroff's West Gardiner home, a set of 2020 COVID-19 orders from the Governor's Office, a photograph of the victim's step-great-grandmother's home, and the principal investigator's Criminal Justice Academy transcript.

describing three occasions, two at Engroff's West Gardiner home and one at the step-great-grandmother's home in Augusta, on which Engroff made her sit next to or on top of him when no one else was around and then felt her breasts and rubbed her vagina. She described the circumstances surrounding each incident in detail. After the video was played, the victim testified.

[¶19] On direct examination, the victim testified about where she lives, her hobbies, her age, her family members, and her visits to Maine to see her father's family, including Engroff, whom she identified in the courtroom. When asked whether Engroff inappropriately touched her and whether she found that offensive, she responded "Yes" to both. She testified to remembering having been interviewed and identified herself in a still shot from the CAC video. She was then cross-examined.

[¶20] On cross-examination, she was asked to confirm the time, location, attendees, and other details regarding the Christmas gathering in 2020. She testified that the gathering occurred at her step-great-grandmother's house in Augusta and that the guests included Engroff. She stated that she stayed at her step-great-grandmother's house for one or two nights, that the guests were not wearing COVID-19 face coverings, and that there was a gift exchange. She said that she did not recall that a third person almost witnessed Engroff abusing her

and added that she did not recall making any statement to that effect at the CAC interview.[8] In response to other cross-examination questions, she testified to her age during each year from 2016 through 2020. On redirect examination, the victim testified that she had told the truth in the CAC interview.

[¶21] Following the victim's testimony, the State introduced testimony from the investigator and the victim's family members. None of the family members claimed to have observed Engroff engage in the charged conduct, but the victim's stepsister was asked if the victim had said that someone had touched her inappropriately and answered "Yes." When asked who did so, the stepsister testified, "Her uncle," and when asked for his name, she said, "Aaron I think."

[¶22] Engroff offered testimony from two other family members, who stated that, although the family had gathered around Christmas 2019, there was no 2020 gathering due to the COVID-19 pandemic. Engroff did not testify. Following closing arguments, Engroff renewed his motion to dismiss on speedy trial grounds. The court noted Engroff's objection on the record but did not alter its prior denial.

---

[8] Her testimony that she did not recall whether someone walked in on the abuse was prompted by a question that the defense asked based on the January 12, 2024, *Brady* letter. *See supra* ¶ 14.

[¶23]  The jury returned a verdict finding Engroff guilty of the three remaining counts involving conduct alleged to have occurred in West Gardiner—two counts of Class B unlawful sexual contact and one count of Class D unlawful sexual touching.  It found Engroff not guilty of the two counts involving conduct alleged to have occurred in Augusta.  Engroff filed a timely motion for a new trial, renewing his speedy trial argument and other issues that he has not raised on appeal.  In March 2024, the court sentenced him to nine years in prison on one of the Class B charges, with all but four years suspended, followed by seven years of probation, and to concurrent sentences on the other Class B charge and the Class D charge.  The court also denied the motion for a new trial.  Engroff timely appealed from his conviction.  *See* 15 M.R.S. § 2115 (2025); M.R. App. P. 2B(2)(b).

## II.  DISCUSSION

### A.    Speedy Trial Issues

[¶24]  Engroff first argues that the court erred in denying his motion to dismiss, asserting a violation of his speedy trial right under the Maine and United States Constitutions, *see* U.S. Const. amend. VI; Me. Const. art. I, § 6.[9]

---

[9] Engroff also invokes M.R.U. Crim. P. 48(b)(1), which, if there is an "unnecessary delay in bringing a defendant to trial," allows the court "upon motion of the defendant . . . [to] dismiss the indictment." Engroff contends that, under our case law, this rule aims to curtail delays, minimize prejudice to

14

Engroff preserved his challenge in the trial court by making a speedy trial demand, later moving to dismiss the indictment, and eventually raising the issue again at trial and in his motion for a new trial. He has preserved the state constitutional component of the challenge by "citing our independent analysis of the state constitutional provision in the relevant precedent and explaining how that precedent supports [his] argument." *See State v. Norris*, 2023 ME 60, ¶ 34, 302 A.3d 1.

[¶25] We follow the "primacy approach," whereby we address the state claim first, "independently of the federal constitutional claim," and "proceed to review the application of the federal Constitution only if the state constitution does not settle the issue" in the appellant's favor. *Athayde*, 2022 ME 41, ¶ 20, 277 A.3d 387. "We review for abuse of discretion a court's judgment on a motion to dismiss a charge for failure to provide a speedy trial." *State v. Hofland*, 2012 ME 129, ¶ 11, 58 A.3d 1023 (quotation marks omitted). We uphold a trial court's exercise of discretion if the factual findings are supported by the record under the clear error standard, the court understood the

defendants, and remedy trial court congestion. *See State v. Wells*, 443 A.2d 60, 63-64 (Me. 1982). We are not persuaded that Rule 48(b)(1) required the court to dismiss the indictment here because, by its plain language, the rule is discretionary. *See* M.R.U. Crim. P. 48(b)(1) ("If there is unnecessary delay in bringing a defendant to trial, the court *may* upon motion of the defendant . . . dismiss the indictment." (emphasis added)). Based on the court's analysis, *see infra* ¶¶ 27-39, of the length of the delay, the reasons for the delay, and the prejudice suffered on account of the delay, we conclude that the court did not abuse its discretion by declining to dismiss the indictment under Rule 48(b)(1).

applicable law, and given the facts and law, the court's weighing of the applicable facts and choices was within the bounds of reasonableness. *State v. Bickart*, 2009 ME 7, ¶ 15, 963 A.2d 183. We begin by examining the law.

### 1. Engroff's Speedy Trial Claim Under the Maine Constitution

[¶26] Article I, section 6 of the Maine Constitution provides: "In all criminal prosecutions, the accused shall have a right . . . [t]o have a speedy, public and impartial trial . . . ." Me. Const. art. I, § 6. In *Winchester*, we expounded upon the speedy trial protections that criminal defendants are afforded under the Maine Constitution. 2023 ME 23, ¶¶ 14-39, 291 A.3d 707. In analyzing a speedy trial question under the Maine Constitution, we consider the same four *Barker* factors that are relevant to a federal analysis under the Sixth Amendment. *See id.* ¶¶ 25-32; *Barker*, 407 U.S. at 530. The factors are the length of the delay, the reasons for the delay, the defendant's assertion of the right, and prejudice. *Winchester*, 2023 ME 23, ¶¶ 25-31, 291 A.3d 707. Still, we have noted "nuances" that cause factors to be weighed differently under the Maine test. *See id.* ¶ 33 (discussing the example that, "a failure to assert the

[speedy trial] right can be determinative under the Maine Constitution but not under the United States Constitution.").[10]

[¶27]  Here, the court aptly weighed the four *Barker* factors in keeping with our holding in *Winchester*.  As the court explained on the record:

> The test that governs Federally is set forth first in *Barker [v.] Wingo*, and then for the State is set forth most recently in the *Winchester [v.] State* case.  Although the rights are not entirely coextensive, there is a significant amount of overlap [and] the way I read *Winchester* is that it is essentially applying the same flexible multifactor test that the Court set forth in *Barker [v.] Wingo* with some nuances.
>
> So the factors I have to look at are the length of the delay, the reasons for the delay, the assertion of the right and prejudice to the defendant.

(Emphasis added.)  We turn to the court's findings and conclusions regarding each factor.

### a.    Length of the Delay

[¶28]  "The speedy trial clock starts with an indictment, arrest, or formal accusation."  *Norris*, 2023 ME 60, ¶ 20, 302 A.3d 1.  A court first looks at the length of the delay; whether the length of the delay is long enough to trigger consideration of the other *Barker* factors is "dependent upon the peculiar

---

[10]  We also determined in *Winchester* that the Maine Constitution did not call for a bright-line rule under which delays greater than one year would be deemed *per se* prejudicial to the defendant. *Winchester v. State*, 2023 ME 23, ¶¶ 34-39, 291 A.3d 707.

circumstances of the case," *Barker*, 407 U.S. at 530-31, such as the number and complexity of the charges, *Winchester*, 2023 ME 23, ¶ 27, 291 A.3d 707. Though we have not announced a precise amount of time needed to justify consideration of the other factors, we relied on federal precedent that "a delay of one year" generally warrants "weighing the other three factors" in finding a twenty-six-month delay to favor the defendant's speedy trial claim in *Norris*, 2023 ME 60, ¶ 23, 302 A.3d 1 (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)).

[¶29] Here, the court found that the delay after indictment was approximately twenty-two months. Noting that delays of more than one year are "presumptively a violation" and require the court "to engage in the additional analysis set forth under the test," the court went on to consider the remaining factors.

### b. Reasons for the Delay

[¶30] "On direct appeal, periods of delay occasioned by the accused should not be counted against the State, but other delays—both those caused by the State and those attributable to court delays and backlogs—should be counted against the State." *Winchester*, 2023 ME 23, ¶ 45, 291 A.3d 707 (citing *State v. Spearin*, 477 A.2d 1147, 1154 (Me. 1984); *State v. Cadman*, 476 A.2d

1148, 1150-52 (Me. 1984). Delays resulting from circumstances outside of the parties' control, such as congested dockets, weigh less heavily against the State than delays that the State causes with the intent to prejudice the defendant. *Cadman*, 476 A.2d at 1152.

[¶31] The court found three different causes for the delay during the eleven-month period between Engroff's assertion of his right to a speedy trial in February 2023 and the hearing on his motion to dismiss in January 2024. First, the court concluded that the subperiod from February 2023 to June 2023 weighed against Engroff because the case could not have been called to trial while the court was addressing Engroff's motion for a bill of particulars and because Engroff tolled his speedy trial right from April 2023 to June 2023. Second, the court concluded that the subperiod from June 2023 to October 2023 weighed against the State based on its findings that Engroff "reassert[ed] his speedy trial right" in June and that the court's own schedule precluded a trial over the summer. *See Winchester*, 2023 ME 23, ¶ 45, 291 A.3d 707 ("[C]ourt delays and backlogs[] should be counted against the State.") Third, the court concluded that the subperiod between October 2023 and January 2024 weighed against Engroff because it found that Engroff's written request, dated October 26, 2023, for a specially set trial date was outside the

bounds of what the court could reasonably accommodate and thus "further delayed the trial." As such, the court concluded that the reasons for the overall delay were attributable to both sides.

[¶32] The court's conclusions with respect to the February-to-June and June-to-October subperiods are supported by the record. The court's conclusion that Engroff was responsible for the delay between October 26, 2023, and January 5, 2024, however, is not entirely supported because the November 3 court order continuing the case until January stated both that it was "due to other scheduling constraints" and that the court could not assign a specific trial date in response to Engroff's request. If the continuance had been entirely due to the court's "scheduling constraints," it is not clear why the order referred to Engroff's request for specific trial dates. The continuance order is therefore somewhat ambiguous as to whether the continuance was necessitated by the court's "scheduling constraints" independent of Engroff's request for specific trial dates or whether Engroff's request factored into the determination regarding the continuance. We thus view the October-to-January delay as occasioned by the court's scheduling issues, at least in part. Scheduling constraints are weighed against the State,

although less heavily than other causes of delay.  *Winchester*, 2023 ME 23, ¶ 45, 291 A.3d 707; *Cadman*, 476 A.2d at 1152.

[¶33]  Nonetheless, we see no reason to disturb the trial court's denial of Engroff's motion to dismiss on speedy trial grounds.  We have not directly considered the effect of a trial court's misattribution of a small fraction of delay in a speedy trial analysis, but we find guidance in decisions from other jurisdictions.  For instance, in *Dillard v. State*, 778 S.E.2d 184, 191 (Ga. 2015), the Supreme Court of Georgia declined to remand the matter where "even if the trial court had properly weighed the second factor lightly against the government, it was incumbent upon the trial court to find no constitutional error given appellant's long delay in asserting his right to a speedy trial and his failure to demonstrate prejudice."  Similarly, Mississippi courts have refrained from remanding matters where, despite deficient trial court determinations, "good cause for the delay is apparent."  *Rowsey v. State*, 188 So. 3d 486, 493 (Miss. 2015).  The Supreme Court of Mississippi recognized that good cause includes exigent circumstance outside of the government's control.  *Id.* at 495 (explaining that a continuance ordered due to a need to find a missing witness is a delay for good cause).  Finally, in a number of other cases where defendants' speedy trial rights were at issue, state courts have noted that remanding

matters creates the unwanted outcome of further delaying a resolution to the case. *State v. Rose*, 202 P.3d 749, 758-59 (Mont. 2009); *see also Nelson v. State*, 915 S.E.2d 541, 554 (Ga. May 6, 2025) (Peterson, C.J., concurring); *State v. Doce*, No. A-3752-21, 2024 WL 2933085, at *5 (N.J. Super. Ct. App. Div. June 11, 2024).

[¶34] Here, we are not persuaded that the court would have reached a different conclusion if it had given the October-to-January delay the weight it was due. For one, the October-to-January delay composed only a fraction of the twenty-two-month delay. In *State v. Hider*, 1998 ME 203, ¶¶ 17-18, 715 A.2d 942, although we acknowledged that a "twenty-two month delay . . . raise[s] a presumption that such delay was not necessary," we noted that "we have been reluctant to find violations of the right to a speedy trial unless the delay is *solely* attributable to the State's conduct, or the State acts in bad faith." Neither of those circumstances occurred here. The court appropriately found that the delay attributable to the State was court-related—thus ruling out bad-faith State action—and that the delay was partially attributable to Engroff's filing of a bill of particulars in February 2023 and tolling of his speedy trial right in April 2023 while he sought to subpoena out-of-state records. Further, the court's own statements indicate that it would not have exercised its discretion differently because the overall responsibility for the delay would still have been

distributed between the parties. In summarizing its findings, the court appropriately stated, "So, in terms of the reasons for the delay, *it is really split between some of it due to the defendant, some due to the [c]ourt's schedule*, which has to weigh against the [S]tate." (Emphasis added.) The court later added, "I am going to find . . . that there is really a split in the period of delay."

[¶35] We turn now to the remaining *Winchester* and *Barker* factors.

### c. Assertion of the Right

[¶36] The court found that Engroff asserted his right, both through his initial speedy trial demand on February 21, 2023, and through his reassertion of the right at the parties' June 7, 2023, docket call. The court reasoned that, despite having tolled his speedy trial demand in April, Engroff could reassert his right once the reasons for the tolling were resolved. *See State v. Johnson*, 498 N.W.2d 10, 16 (Minn. 1993) ("[D]elay occasioned by the defendant himself is often deemed a temporary waiver of his speedy trial demand, which can only be revived when the defendant reasserts his speedy trial right."); *see also State v. Finn*, 469 N.W.2d 692, 694 (Iowa 1991) (acknowledging the possibility of reasserting previously waived speedy trial rights). The court, accordingly, appropriately ruled that this factor favored Engroff.

### d.     Prejudice

[¶37]   With respect to prejudice, the "right to a speedy trial seeks to prevent: (1) undue and oppressive incarceration prior to trial; (2) the accused's anxiety and concern accompanying public accusation, and (3) impairment of the accused's ability to mount a defense."[11]  *Winchester*, 2023 ME 23, ¶ 30, 291 A.3d 707.   Under the Maine Constitution, incarceration is given significant weight as a form of prejudice.  *Id.* ¶ 31.  The court found that Engroff suffered from the publicity associated with the charges[12] and that the passage of time since 2020 would have impacted the memory of witnesses, but it concluded that the overall degree of prejudice was limited because he was not incarcerated while awaiting trial.   The court's findings and conclusion are well-supported in the record and well-founded on *Winchester.*

[¶38]   Engroff argues that the court erred by not considering an additional form of prejudice—namely, that the Maine Legislature enacted the statute authorizing admission of the CAC video while his case was pending.

---

[11]   In parallel to the pretrial-incarceration inquiry, courts may also consider whether bail conditions create significant restrictions on a defendant's liberty.  *See Moore v. Arizona*, 414 U.S. 25, 26-27 (1973) (stating that a delay may interfere with a defendant's liberty "whether he is free on bail or not" since it "may disrupt his employment, drain his financial resources, [and] curtail his associations" (quotation marks omitted)).   Engroff's assertion of prejudice resulting from his bail conditions is that he was prevented from seeing his children without a chaperone.

[12] *See supra* n.4 (discussing the adverse employment consequences that Engroff suffered).

24

*See* 16 M.R.S. § 358; P.L. 2023, ch. 193, § 1 (effective Oct. 25, 2023) (codified at 16 M.R.S. § 358 (2024)).  We do not view the effect of legislative enactments during the pendency of a case as a cognizable form of prejudice for purposes of the right to a speedy trial, nor has Engroff cited any authority for that premise.  The forms of prejudice that count in the determination of a speedy trial violation are those that are aggravated by delay, such as prolongation of incarceration and impairment of the ability to mount a defense.  Legislative enactments are unrelated to delay and are not independently prejudicial.

[¶39]  In weighing its findings about prejudice alongside the other three *Barker* factors, the court ruled that Engroff's speedy trial right under the Maine Constitution was not violated.  On review, we conclude that based on the court's findings and conclusions with respect to the four factors, the court did not abuse its discretion in denying Engroff's state speedy trial claim.

2.  **Engroff's Speedy Trial Claim Under the United States Constitution**

[¶40]  As Engroff points out, although the same four factors apply in a speedy trial analysis under the Maine Constitution as under the United States Constitution, the factors are evaluated somewhat differently.  For example, "a failure to assert the right [to a speedy trial] can be determinative under the Maine Constitution but not under the United States Constitution."  *Winchester*,

2023 ME 23, ¶ 33, 291 A.3d 707. Engroff's federal constitutional argument, however, focuses mainly on what he asserts is the prejudicial effect of the legislation that allowed admission of the CAC video in evidence.[13] Our view that the effect of legislation on a case is not a cognizable form of prejudice for purposes of the right to a speedy trial applies to analyses under both the Maine Constitution and the United States Constitution. *See Barker* 407 U.S. 514, 532 (identifying the same three categories of prejudice that are relevant to speedy trial analysis under the Maine Constitution). Therefore, Engroff's right to a speedy trial under the United States Constitution also was not violated.

## B. Engroff's Objections to the Admission of the CAC Video

[¶41] The court admitted the CAC video in evidence after determining that the video complied with the requirements of 16 M.R.S. § 358. Section 358 effectively establishes a limited hearsay exception by enabling the admission in evidence of a video recording of an out-of-court forensic interview of a

---

[13] Engroff also asserts that delays initiated by a court's overcrowded docket should weigh more greatly against the State in a federal analysis. We disagree—*Barker* indicates that court-occasioned delays should weigh less heavily against the State than delays by the State intended to hamper the defense. *Barker v. Wingo*, 407 U.S. 514, 531 (1972); *see also State v. Cadman*, 476 A.2d 1148, 1152 (Me. 1984) (stating the same principle as a matter of state law by referring to *Barker*).

26

"protected person,"[14] provided that the recorded interview meets specified criteria.[15] 16 M.R.S. § 358(3). These include requirements that there be no leading questions during the interview, that no attorney or relative of the interviewee be present, that the interviewer meet specified forensic qualifications, and that the interview be otherwise admissible under the Maine Rules of Evidence. *Id.* § 358(2), (3)(A)-(D), (3)(H). In criminal cases, the statute conditions admission of the video on the interviewee being "called as a witness by the party offering the recording in evidence immediately following the presentation of the recording to the trier of fact and made available for cross-examination, unless all other parties expressly waive the requirement that the witness testify." *Id.* § 358(3)(G).

[¶42] Engroff argues that the video's admission violated his confrontation right under the Maine Constitution and involved the improper application of section 358 to a pending case. We address each issue in turn.[16]

---

[14] The statute defines "[p]rotected person" as an individual either under the age of eighteen or eligible for services under the Adult Protective Services Act. 16 M.R.S. § 358(1)(C); *see* 22 M.R.S. §§ 3470-3493 (2025).

[15] Engroff has not challenged the statute based on the judiciary's authority, as a matter of statute and the constitutional separation of powers, to promulgate rules of evidence applicable in civil and criminal proceedings. *See* Me. Const. art III, §§ 1-2; 4 M.R.S. § 9-A (2025). We decline to address this issue here but note our analysis of the question in *State v. Thorndike*, 2025 ME 61, ¶¶ 25-28, --- A.3d ---.

[16] Engroff also argues that the video's admission denied him due process under the Maine Constitution. We conclude that this argument was not preserved. *See infra* n.29.

### 1. Engroff's Confrontation Argument Regarding the CAC Video

[¶43]  As an initial matter, we note that Engroff has not taken adequate steps to preserve his right to challenge the constitutionality of section 358 under the Maine Confrontation Clause.  To be sure, Engroff did cite the Maine Confrontation Clause when arguing against the video's admissibility before the trial court, and he also offers an independent analysis of the Maine Confrontation Clause on appeal.  But in the trial court Engroff failed to engage in the same focused analysis of the relevant provision of the Maine Constitution that he engages in on appeal.  *See State v. White*, 2022 ME 54, ¶ 31 n.13, 285 A.3d 262 (noting that in the absence of independent analysis of the state constitutional provision before the trial court, "we ordinarily would not deem a state constitutional claim preserved"); *State v. Wilcox*, 2023 ME 10, ¶ 9 n.4, 288 A.3d 1200 (concluding that a state constitutional argument was not preserved where the party did not distinguish between the Maine and federal constitutions at the trial level).  Despite Engroff's failure to preserve his Maine Confrontation Clause challenge to section 358 at trial, we elect to consider the issue because the issue is one that is likely to recur.[17]  *See White*, 2022 ME 54,

---

[17]  On the date of oral argument in this appeal, we heard oral argument in a separate case where the constitutionality of section 358 under the Maine Confrontation Clause was also at issue.  *See State v. Havens*, No. Pen-24-37 (Me. Jan. 5, 2024).

¶ 31 n.13, 285 A.3d 262 (reviewing a state constitutional issue that was not preserved at trial); *Willis v. Bernini*, 515 P.3d 142, 147 (Ariz. 2022) (electing to consider a waived issue that was "of great public importance or likely to recur" (quotation marks omitted)).

[¶44]  In his argument that the admission of the CAC video violates his rights under the Maine Confrontation Clause, Engroff argues that the Clause, as read and interpreted, requires that witnesses testify "face-to-face" with the defendant and jury and therefore bars the admission of a witness's pre-recorded testimony.[18]

[¶45]  "We review questions of constitutional interpretation de novo." *State v. Reeves*, 2022 ME 10, ¶ 42, 268 A.3d 281.  "When we construe the Maine Constitution, our review can embrace, without limitation, an examination of text; purpose; history; common law, statutes, and rules; economic and sociological considerations; and precedent." *Winchester*, 2023 ME 23, ¶ 14, 291 A.3d 707.  Federal precedent of counterpart federal constitutional provisions is a source of potentially persuasive, but not binding, authority in our

---

[18]  Engroff argues that even apart from what he asserts is the Maine Confrontation Clause's face-to-face requirement, the admission of witness testimony recorded outside the courtroom offends the Clause's purpose of ensuring the admission of reliable evidence.  We view Engroff's "face-to-face" argument to incorporate issues of reliability and thereby subsume his separate argument.  Accordingly, we do not separately analyze reliability.

interpretation of the Maine Constitution. *See State v. Fleming*, 2020 ME 120, ¶ 17 n.9, 239 A.3d 648. We proceed to analyze these various sources to interpret the Maine Confrontation Clause.

### a. Text

[¶46] The Maine Constitution provides: "In all criminal prosecutions, the accused shall have a right . . . [t]o be confronted by the witnesses against the accused." Me. Const. art. I, § 6. As a matter of plain text, the Maine Confrontation Clause parallels the federal Confrontation Clause, which states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.[19] This similarity acquires relevance given that the Massachusetts Declaration of Rights, on which the Maine Constitution was modeled, includes a differently worded confrontation

---

[19] Engroff urges us to attach determinative significance to the Maine Constitution's use of "confronted *by*" instead of "confronted *with*," the phrase in the Sixth Amendment. Citing no authority that contrasts these two formulations, he asserts:

> "By" suggests that the witness against a defendant must take some action; "with," in comparison, suggests merely the opportunity to confront a witness (i.e., cross-examination). Defendant suggests that this is a textual indication that the Maine Constitution protects more than merely the right to cross-examine a witness: It imposes an obligation for the witness, when available, to level her allegations via direct examination.

(Emphasis omitted.) We see no substantive difference in the import of the two prepositions "by" and "with" in this context. A defendant confronted "with" a witness is necessarily confronted "by" the witness, and vice-versa. *See State v. Stephanie U.*, 261 A.3d 748, 760 (Conn. App. Ct. 2021) (stating that the Connecticut Confrontation Clause, featuring the same "confronted by" language as Maine's, was "virtually identical to that in the sixth amendment to the federal constitution").

provision: article XII of the Massachusetts Declaration of Rights provides that "every subject shall have a right . . . to meet the witnesses against him face to face." Mass. Const. pt. 1, art. XII. Although this disparity in wording can be interpreted to indicate that the framers of the Maine Constitution intended to model its confrontation clause on its federal counterpart,[20] the framers' drafting practices and our early case law lead us to conclude that the absence of the "face to face" language from the Maine Confrontation Clause is not dispositive of the question of whether live, in-person confrontation is required in all instances.[21]

---

[20] The divergence of article I, section 6 from the "face to face" language also indicates alignment with—and perhaps inspiration from—Blackstone. *See* Richard D. Friedman & Bridget McCormack, *Dial-in Testimony*, 150 U. Pa. L. Rev. 1171, 1203 n.116, 1207 (2002) (noting that some early state constitutions "used the time-honored 'face to face' phrase" whereas "others, following Hale and Blackstone, adopted language strikingly similar to that later used in the Sixth Amendment's Confrontation Clause").

As we noted in *Winchester*, the Maine Constitutional Convention deviated from the Massachusetts Declaration of Rights "'only . . . where experience of [Maine] and of other States in the Union seemed to justify and require it.'" 2023 ME 23, ¶ 15 n.6, 291 A.3d 707 (quoting Address, *reprinted in* Debates and Journal of the Constitutional Convention of the State of Maine (1819–20) pt. 3, at 105-06 (1894)).

[21] The framers may also have omitted the "face to face" language of the Massachusetts Declaration of Rights because they preferred brevity and simplicity where possible. *See* Tinkle, *The Maine State Constitution* 7 (2d ed. 2013) (noting generally that the framers "omitted nearly all that was not truly fundamental"). Additionally, despite the absence of such a phrase in the Maine Confrontation Clause, we noted the importance of face-to-face confrontation in our older cases, *see infra* ¶ 49. Finally, some courts in other jurisdictions with constitutions that do use the expression "face to face" have given this language little, if any, force and have interpreted their confrontation clauses in line with clauses that omit the phrase "face to face." *E.g., State v. Foster*, 957 P.2d 712, 721-22 (Wash. 1998).

### b.  Common Law, Historical Context, and the Purpose of the Confrontation Right

[¶47]  The right of defendants to be confronted by their accusers derives from English common law.  *See State v. Crooker*, 123 Me. 310, 312, 122 A. 865, 866 (1923) ("[This] fundamental rule of the English common law [is] embodied in both the state and federal Constitutions."); Tinkle, *The Maine State Constitution* 38 (2d ed. 2013) ("All of the rights in section 6 have their ultimate origins in Magna Carta or English common law.").  The confrontation right evolved as a response to the practices of justices of the peace in felony cases to examine witnesses outside of the defendant's presence and subsequently repeat what the witnesses had said at the trial.  *See Crawford v. Washington*, 541 U.S. 36, 43-45 (2004) (discussing the 1603 conviction of Sir Walter Raleigh for treason based on out-of-court testimony, given by Raleigh's alleged accomplice, that was read to the jury); *see also Michigan v. Bryant*, 562 U.S. 344, 357-58; *State v. Sheppard*, 2024 ME 84, ¶ 28, 327 A.3d 1144.

[¶48]  According to a leading evidence treatise cited in our precedents, "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."[22]  5 John Henry Wigmore, *Evidence in*

---

[22]  Other sources also identify cross-examination as the linchpin of the confrontation right but argue that the centrality of cross-examination only became apparent in the early nineteenth century.

*Trials at Common Law* § 1395, at 150 (Chadbourn rev. 1974) (emphasis omitted); *see also id.* ("[I]n case of treason, where two witnesses [i.e., accusers] are required, such an examination [before a justice of peace] is not allowable, for the statute requires that they be produced upon the arraignment in the presence of the prisoner, to the end that he may cross-examine them." (quoting 1 Matthew Hale, *The History of the Pleas of the Crown* 306 (1680) (brackets in original)); *id.* at 151 ("The other side ought not to be deprived of the opportunity of confronting the witnesses and examining them publicly, which has always been found the most effectual method for discovering of the truth." (quoting *Duke of Dorset v. Girdler*, Finch's Prec. Ch. 531 (1720)); *State v. Herlihy*, 102 Me. 310, 313, 66 A. 643, 645 (Me. 1906) (treating section 1395 of Wigmore's treatise as authoritative on the Maine Confrontation Clause). Wigmore states that a secondary benefit of confrontation is the opportunity for the judge and jury to evaluate a witness's "deportment while testifying." Wigmore, *supra*, §§ 1395-1396, at 153 (emphasis omitted). However, Wigmore clarifies that "the secondary advantage, incidentally obtained for the tribunal

---

*See* Thomas Y. Davies, *Revisiting the Fictional Originalism in Crawford's "Cross-Examination Rule": A Reply to Mr. Kry*, 72 Brook. L. Rev. 557, 566 (2007); 30 Charles Alan Wright et al., *Federal Practice and Procedure* § 6337 (2d ed. 2020); *see also* 5 Jeremy Bentham, *Rationale of Judicial Evidence, Specially Applied to English Practice* 211-12 n.* (1827) (noting that, by 1827, cross-examination was the "grand security" for truth-seeking).

by the witness' presence before it—the demeanor-evidence—is an advantage to be insisted upon wherever it can be had. . . . But it is merely desirable." *Id.* § 1396, at 154.[23]

### c. Maine Precedent

[¶49] Our early confrontation cases framed the purposes of confrontation similarly. As Engroff observes, one purpose is "to guard the accused in all matters, the proof of which depends upon the veracity and memory of witnesses, against the danger of falsehood or of mistake, by bringing the witnesses when they give their testimony as to such matters *face to face* with him." *State v. Frederic*, 69 Me. 400, 401 (1879) (emphasis added); *see also State v. Learned*, 47 Me. 426, 434 (1859) ("It is a right belonging to the humblest to meet his accuser face to face . . . ."). Another purpose is to guarantee "the constitutional privilege to cross-examine [opposing witnesses]." *Crooker*, 123 Me. at 312, 122 A. at 866. However, we have explicitly delineated cross-examination as the more important purpose: "[T]he main and essential purpose of confrontation is to secure the opportunity of cross-examination; . . . although there is a secondary purpose, that of having a witness present before

---

[23] Although Wigmore's explanation of the purposes of confrontation—and particularly the centrality of cross-examination—is useful insofar as our precedent has relied upon it, we do not subscribe to Wigmore's entire historical account of the confrontation right, as his account has been the subject of critical scrutiny. *See, e.g.*, Charles Alan Wright et al., *supra* n.22, §§ 6337, 6338.

34

the tribunal which is engaged in the trial of the case, this is merely desirable . . . ." *Herlihy*, 102 Me. at 313, 66 A. at 645.

[¶50] In fact, we have more than once indicated that the opportunity to cross-examine standing alone is sufficient to accommodate a defendant's confrontation right, thereby rendering "face-to-face" confrontation dispensable.[24] We have said, "If there has been a cross-examination, there has been a confrontation. The satisfaction of the right of cross-examination disposes of any objection based on the so-called right of confrontation." *Id.*, 66 A. at 645 (quotation marks omitted). Similarly, in *Crooker*, we equated the right of confrontation with the opportunity to cross-examine: "The constitutional right of confrontation is preliminary to and but another name for the right of cross-examination." *Crooker*, 123 Me. at 313, 122 A. at 866.

### d.    Precedent from Other Jurisdictions

[¶51] Other jurisdictions highlight the importance of cross-examination in the context of pre-recorded witness statements. Concerning the Sixth Amendment, the Supreme Court stated that "when the declarant appears for

---

[24] Further, we have historically endorsed the admission of out-of-court statements against defendants in criminal cases pursuant to various hearsay exceptions, even when there is no ability to cross-examine. *See, e.g., State v. Wagner*, 61 Me. 178, 194-95 (1873) (dying declaration exception).

cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 59 n.9.

[¶52]  We applied this holding from *Crawford* in two cases in which we examined whether the federal Confrontation Clause barred the admission of pre-recorded child testimony. *See State v. Gorman,* 2004 ME 90, ¶ 55, 854 A.2d 1164; *State v. Adams*, 2019 ME 132, ¶ 21, 214 A.3d 496. [25]  In *Gorman*, 2004 ME 90, ¶¶ 15-17, 55, 854 A.2d 1164, a redacted audio recording of the defendant's mother's grand jury testimony was played for the jury at the defendant's criminal trial under the recorded recollection hearsay exception, *see* M.R. Evid. 803(5), upon a showing that the criteria in the rule were satisfied and that she was available for cross-examination.  There, we rejected the defendant's challenge under the federal Confrontation Clause. *Id.* ¶¶ 46-55.  In *Adams*, 2019 ME 132, ¶¶ 5-9, 214 A.3d 496, we considered whether the admission of pre-recorded child testimony violated the federal Confrontation Clause where,

---

[25]  Although Maine case law interpreting a counterpart federal constitutional provision is not, as a general matter, relevant to a primacy analysis, *see Winchester*, 2023 ME 23, ¶ 14, 291 A.3d 707, our decisions in *Gorman* and *Adams* bear directly on the admissibility of the pre-recorded child testimony, so we find them persuasive in this specific context. *See State v. Fleming*, 2020 ME 120, ¶ 17 n.9, 239 A.3d 648 ("[F]ederal precedent serv[es] as potentially persuasive but not dispositive guidance with respect to constitutional provisions with similar goals."); *State v. Reeves*, 2022 ME 10, ¶ 41, 268 A.3d 281 ("Under our primacy approach, we first examine the defendant's claim under the Maine Constitution and interpret the Maine Constitution independently of the federal Constitution. In interpreting the Maine Constitution, however, we may consider federal precedent to the extent that we find that precedent persuasive." (citation omitted)).

36

as in *Gorman*, the defense was allowed to cross-examine the witness at trial. The State introduced the pre-recorded video testimony of the alleged victim under the recorded recollection exception. *Id.* ¶¶ 1, 5, 7-8; M.R. Evid. 803(5). We held that the defense's opportunity to cross-examine the child witness at trial made the pre-recorded video admissible under the federal constitution. *Adams*, 2019 ME 132, ¶¶ 20-22, 214 A.3d 496; *see also State v. Bell*, 438 P.3d 104, 109-10 (Utah Ct. App. 2018) (upholding the admission of a child victim's recorded interview because the victim appeared for cross-examination at trial); *United States v. Counts*, 39 F.4th 539, 543-44 (8th Cir. 2022) (same).

[¶53] Finally, even jurisdictions that—unlike Maine—employ the "face to face" confrontation language, *e.g.,* Ind. Const. art. I, § 13; Del. Const. art. I, § 7, have upheld legislation allowing the admission of pre-recorded child testimony where the child was available for cross-examination at trial. *See Pierce v. State*, 677 N.E.2d 39, 48-50 (Ind. 1997); *Dailey v. State*, 956 A.2d 1191, 1194 (Del. 2008).[26]

---

[26] The relevant Delaware statute provides: "An out-of-court statement made by a child victim or witness who is under 11 years of age at the time of the proceeding concerning an act that is a material element of the offense relating to sexual abuse, physical injury, serious physical injury, death, abuse or neglect . . . is admissible in any judicial proceeding if . . . [t]he child is present and the child's testimony touches upon the event and is subject to cross-examination rendering such prior statement admissible under § 3507 of this title." Del. Code Ann. tit. 11, § 3513(b)(1) (West, Westlaw through chapter three of the 153rd General Assembly).

### e.  Rules and Statutes Addressing Hearsay and Child Hearsay

[¶54]  The evolution of Maine statutes and court rules governing the admissibility of out-of-court testimony likewise informs our interpretation of the Maine Confrontation Clause.  Until 1976, when the Maine Rules of Evidence took effect after being promulgated pursuant to an enabling act, P.L. 1973, ch. 675 (effective June 28, 1974) (codified at 4 M.R.S.A. § 9-A (Supp. 1974)), the common law governed the admissibility of hearsay evidence.  *See* Richard H. Field, *The Maine Rules of Evidence: What They Are and How They Got That Way*, 27 Me. L. Rev. 203, 203-08 (1975); *State v. Williams*, 388 A.2d 500, 506 (Me. 1978) (Nichols, J. concurring).  The common law at the time the Maine Constitution was adopted generally prohibited the admission of hearsay evidence but also recognized multiple exceptions, many of which are now codified in the Maine Rules of Evidence.  *See* M.R. Evid. 801-806.[27]  Moreover, there was no categorical common law prohibition on the admission of child

---

[27] In one of our early cases, we explained,

> By the general rule of law, hearsay evidence of a fact in controversy, is not admissible. To this rule there are certain well established exceptions; as in questions of pedigree, custom, certain entries or writings, which fall within the principle of hearsay evidence, of a party charging himself, or restraining his own right thereby; and declarations making part of the *res gesta.*

*Chadwick v. Webber*, 3 Me. 141, 145 (1824).

hearsay at the time the Maine Constitution was ratified in 1820. As the Supreme Court has acknowledged, a child's statements were historically held to be admissible at common law when the statements were made to individuals keeping the child safe in an emergency. *Ohio v. Clark*, 576 U.S. 237, 248 (2015). Commentators have also debated the extent to which child hearsay was admissible at common law in English courts and whether those rules carried over to the United States in the eighteenth century. *See* Thomas D. Lyon & Raymond LaMagna, *The History of Children's Hearsay: From Old Bailey to Post-Davis*, 82 Ind. L.J. 1029, 1030-32 (2007) (noting that eighteenth-century English courts routinely admitted children's hearsay statements if the child was found incompetent); Thomas Y. Davies, *Not "The Framers' Design": How the Framing-Era Ban Against Hearsay Evidence Refutes the* Crawford-Davis *"Testimonial" Formulation of the Scope of the Original Confrontation Clause*, 15 J.L. & Pol'y 349, 391-92, 444-46 (2007) (claiming that the admissibility of children's hearsay in eighteenth-century England was variable); Robert P. Mosteller, *Testing the Testimonial Concept and Exceptions to Confrontation: "A Little Child Shall Lead Them,"* 82 Ind. L.J. 917, 924-25 (2007) (questioning whether the framers of the United States Constitution sought to incorporate idiosyncrasies of English common law).

### f.      Sociological Developments Related to Child Testimony

[¶55]   A key premise of section 358 is that, by admitting in evidence a child's description of a defendant's criminal sexual acts recorded as soon as they come to light, courts can properly prevent child victims' re-exposure to the underlying trauma from their abuse.  That premise is by no means new.  In 1986, the Court's Advisory Committee on the Rules of Evidence proposed two rules of evidence to the Supreme Judicial Court regarding the admissibility of child witness testimony.   *See* Letter from Peter L. Murray, Esq. to Hon. Vincent L. McKusick, (Feb. 13, 1987) (on file with the Nathan & Henry B. Cleaves Law Library).  The proposed rules, numbered Rule 803(24) and Rule 807, "deal[t] respectively with out-of-court statements by child witness-victims in sexual offense, abuse and neglect cases, and videotaped testimony of child witness-victims in certain sex crimes."  *Id.*  The Advisory Committee's note on the proposed Rule 807 addressed the social costs of requiring in-person testimony from child sexual abuse victims:[28]

> The Court has recognized that competing considerations of public policy and the necessity of a case may warrant dispensing with actual confrontation at trial.  *See Ohio v. Roberts*, 448 U.S. at 64.  The State holds an interest in protecting young children, allegedly the

---

[28]   The Advisory Committee's analysis was under the pre-*Crawford* confrontation jurisprudence, whereby the Confrontation Clause did not bar out-of-court statements if they were reliable, whether due to a "firmly rooted hearsay exception" or otherwise.  *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).

victims of sexual abuse, from further victimization, if there is a substantial likelihood that the child would suffer emotional trauma. *See Ginsberg v. New York*, 390 U.S. 629, 640 (1968). Although actual confrontation at trial is eliminated under the Rule, the interests secured by the Confrontation Clause are preserved by the Rule. The defendant is provided a full opportunity for cross-examination and with ample notice that the child's recorded or transmitted testimony may be offered in lieu of the child's testimony in open court. In addition to the right to cross-examine, the rule also preserves the other essential elements of the right to confrontation: the oath, the presence of the defendant at the time the statement is made and the defendant's and fact finder's opportunity to observe the witness' demeanor.

Advisory Committee on the Rules of Evidence, Committee Note on Proposed Rule 807, at 9-10 (1987) (on file with the Nathan & Henry B. Cleaves Law Library).

[¶56] The legislative rationale for 16 M.R.S. § 358 is similar. *See An Act to Permit Recordings of a Protected Person To Be Admissible in Evidence: Hearing on L.D. 765 Before the J. Standing Comm. on Judiciary*, 131st Legis. 1 (2023) (testimony of Sen. Anne Carney, sponsor of L.D. 765) ("This legislation, if enacted, will achieve the important policy goal of protecting Maine's most vulnerable population, children and disabled adults, from sexual assault and physical abuse . . . [given] the difficulty children have testifying in court.").

[¶57] Child-hearsay statutes are not fundamentally inconsistent with the broad goal of ensuring the reliability of evidence admitted at trial and, in fact,

can be crafted to advance that goal. "The principal reason behind the general rule against hearsay admissibility is to prevent the introduction of unreliable evidence. However, children's hearsay statements concerning abuse are not necessarily unreliable because the child declarant produces the statement through firsthand knowledge and temporally closer to the abuse than if the statement were made in court." Archita Dwarakanath, *Expanding the Scope of Child Hearsay Exceptions*, 102 B.U. L. Rev. 1685, 1720 (2022) (footnote omitted). By contrast, as social science and psychological research on the suggestibility of children indicates, cross-examining children in the courtroom may not serve the goal of obtaining truthful testimony. Jonathan Clow, *Throwing a Toy Wrench in the "Greatest Legal Engine": Child Witnesses and the Confrontation Clause*, 92 Wash. U. L. Rev. 793, 794 (2015) (emphasizing that children are suggestible and at times struggle to recall events after a long time has passed).

[¶58] In sum, after reviewing the text of the Maine Confrontation Clause, the provision's history and purpose, its common law roots, relevant precedent in Maine and other jurisdictions, relevant rules and statutes, and sociological developments related to child testimony, we disagree with Engroff's contention that the Maine Constitution requires that the defendant be face-to-face with the

witness throughout the witness's testimony. We therefore hold that, like the Sixth Amendment, *see Crawford*, 541 U.S. at 59 n.9, the Maine Confrontation Clause does not prohibit the admission of out-of-court statements provided that the declarant is available for cross-examination about them.

### 2. Engroff's Argument That the Court Erred by Applying 16 M.R.S. § 358 to a Pending Case in Violation of 1 M.R.S. § 302 (2025)

[¶59] Engroff argues that the court committed obvious error by admitting the CAC video because, as originally enacted, 16 M.R.S. § 358 did not apply to his case.[29] Engroff concedes that he did not preserve this issue at trial.

[¶60] Whether section 358 applied is an issue of statutory interpretation that we review de novo. *See State v. Jones*, 2012 ME 88, ¶ 6, 46 A.3d 1125. The rules of evidence to be applied at trial are those in effect at the time of trial. *See*

---

[29] Engroff separately argues that the admission of the CAC video pursuant to 16 M.R.S. § 358 violated his right to due process under the Maine Constitution because he acquired a vested right to have his case decided under the law applicable when he made his speedy trial demand in February 2023, and section 358 did not take effect until later. However, Engroff failed to preserve this argument because, despite referring to his due process right on multiple occasions before the trial court, he did not offer an independently developed argument at the trial level, *see State v. White*, 2022 ME 54, ¶ 31 n.13, 285 A.3d 262; *State v. Wilcox*, 2023 ME 10, ¶ 9 n.4, 288 A.3d 1200. Even if the argument had been preserved, it suffers from two flaws when considered in light of our recent cases involving retroactive legislation that impaired vested rights, *see Dupuis v. Roman Cath. Bishop of Portland*, 2025 ME 6, 331 A.3d 294; *NECEC Transmission LLC v. Bureau of Parks & Lands*, 2022 ME 48, 281 A.3d 618. One flaw in Engroff's effort to invoke the vested rights doctrine based on his speedy trial demand is that section 358 is not retroactive legislation, because it applies prospectively, originally from its effective date and then, as a result of the amendment, from its date of enactment. The other flaw is that the right to a speedy trial does not govern what law is applied at trial. *Cf. Winchester*, 2023 ME 23, ¶ 33, 291 A.3d 707 (identifying remedies for excessive delay without mentioning the option of foregoing changes in the law as a remedy). Hence, Engroff's speedy trial demand had no effect on the application of section 358.

*State v. Tracy*, 2010 ME 27, ¶¶ 17-18, 991 A.2d 821; *Berry v. Lisherness*, 50 Me. 118, 121 (1862); *see also* M.R. Evid. 101(a) ("[T]hese rules apply to all actions and proceedings."). However, statutes, including those promulgating evidentiary standards, are subject to 1 M.R.S. § 302 (2025), which provides: "Actions and proceedings pending at the time of the passage, amendment or repeal of an Act or ordinance are not affected thereby." "This general rule may be overcome, however, if the new legislation expressly cites section 302 or explicitly states an intent to apply to pending proceedings." *State v. Beeler*, 2022 ME 47, ¶ 1 n.1, 281 A.3d 637 (discussing a statute regulating evidence of impaired operation of a motor vehicle).

[¶61] Engroff's argument calls for a review of the history of section 358. On June 16, 2023, section 358 was enacted as non-emergency legislation, so it took effect on October 25, 2023, ninety days after adjournment of the legislative session in which it was enacted and nineteen months after Engroff was indicted. P.L. 2023, ch. 193, § 1 (effective Oct. 25, 2023) (codified at 16 M.R.S. § 358 (2024)). The legislation did not provide that it applied to pending proceedings. After Engroff's trial in January 2024, the Legislature enacted an emergency amendment to the statute, P.L. 2023, ch. 646, § D-1 (codified at 16 M.R.S.

44

§ 358(5) (2025)), which took effect on April 22, 2024.  The amendment added

a new subsection (5) to section 358:

> **5.    Applicability.**   Notwithstanding Title 1, section 302, this section applies to:
>
> > A.  Cases pending on June 16, 2023; and
> >
> > B.  Cases initiated after June 16, 2023, regardless of the date on which the conduct described in the forensic interview allegedly occurred.

16 M.R.S. § 358(5) (2025).[30]  The committee amendment in which the language

was introduced included a summary stating that it

> clarifies the intent of the Legislature that the exception to the hearsay rule for recordings of forensic interviews . . . applies to proceedings pending on the date that the law was enacted and to proceedings initiated after that date, regardless of when the conduct described in the forensic interview allegedly occurred.

Comm. Amend. to L.D. 2290, No. H-982 (131st Legis. 2023).  To summarize,

section 358 contained no statement overriding the rule of 1 M.R.S. § 302 at the

time of Engroff's trial, but it does now, as a result of this amendment, *see* P.L.

2023, ch. 646, § D-1.

---

[30]  In *Thorndike*, we held that the emergency amendment of section 358 did not violate the Maine Constitution's requirements for emergency legislation or the Maine Constitution's separation-of-powers provisions.  2025 ME 61, ¶¶ 24, 28, --- A.3d ---; Me. Const. art. III; *id.* art. IV, pt. 3, § 16.

[¶62]   A court may consider subsequent amendments to a statute in determining the legislative intent underlying the statute.   2B Norman Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 49:10 (7th ed. 2012) ("Where a legislature amends a former statute, or clarifies a doubtful meaning by subsequent legislation, such amendment or subsequent legislation is strong evidence of the legislative intent behind the first statute.").   The interpretive weight of an amendment depends on whether the amendment is a clarification of or a substantive change to the original statute.  *See United States v. Martinez*, 946 F.2d 100, 102 (9th Cir. 1991) ("A subsequent amendment may be entitled to substantial weight in construing earlier law when it plainly serves to clarify rather than change the existing law.").

[¶63]   Here, the 2024 amendment to section 358 was explicitly designated as a clarification only.  Although the court's determination that section 358 applied to Engroff's case was incorrect at the time it was made, the after-the-fact effect of the clarification was to validate the determination. There was no obvious error in the court's admission of the video, especially given that the precedent we established in *Adams* furnishes independent support for the admission of the video.  *See supra* ¶ 52; *State v. Pabon*, 2011 ME 100, ¶ 26, 28 A.3d 1147 (indicating that an error is not obvious error unless it "seriously

affects the fairness and integrity, or public reputation of judicial proceedings" (quotation marks omitted)). A further consideration is that, even if we were to vacate Engroff's conviction on this ground, section 358 would plainly apply at the new trial. Thus, there is no meaningful relief we can grant to Engroff on this issue, rendering the issue moot in any event. *Mainers for Fair Bear Hunting v. Dep't of Inland Fisheries & Wildlife*, 2016 ME 57, ¶ 5, 136 A.3d 714 ("An issue is moot when there is no real and substantial controversy, admitting of specific relief through a judgment of conclusive character." (quotation marks omitted)).

The entry is:

> Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Aaron C. Engroff

Maeghan Maloney, District Attorney, and Shannon Flaherty, Asst. Dist. Atty. (orally), Prosecutorial District IV, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2022-341
FOR CLERK REFERENCE ONLY